FRUIT DISPATCH COMPANY, APPELLEE, v. BERNARD GILINSKY, APPELLANT.[*]

FILED JUNE 25, 1909.    No. 15,743.

1. **Contracts: CORRESPONDENCE.** By means of letters exchanged in due course of mail, parties may make a contract in writing without inserting all of its terms in a single instrument, and a receipt describing a definite, printed agreement and accepting its provisions may perform the office of a letter in that respect.

2. **Sales: CONTRACT: EVIDENCE.** A special finding of a jury that a contract printed in the back of a book containing a cipher code and embodying uniform conditions of sale was executed by an importer of tropical fruits and a wholesale dealer therein, *held* to be sustained by the evidence in the record.

3. **Principal and Agent: SCOPE OF AUTHORITY.** An agent acting within the scope of his apparent authority, though outside of his actual authority, may bind his principal by acts affecting innocent third parties.

4. **Statute of Frauds: STATUTE OF ANOTHER STATE.** Where the Iowa statute of frauds is pleaded in Nebraska to defeat an Iowa contract, the law of that state controls as to such defense.

5. **Sales: DELIVERY.** Subject to exceptions, a general rule applicable to sales is that a delivery to a carrier is a delivery to the purchaser and consignee.

6. ———: **TRANSFER OF TITLE: DELIVERY.** On a record showing that a wholesale dealer in tropical fruits at Council Bluffs ordered a can of bananas from an importer, knowing it was being shipped northward from the seaport at New Orleans under a bill of lading not disclosing a destination or consignee, the trial court properly held that the title was transferred in the hands of the carrier and the bananas delivered to the purchaser as soon as his name as consignee and the proper destination were inserted in the bill o" lading by order of the consignor after he accepted the order, . . being no contrary agreement, and the proof showing that the bananas at the time complied with the order as to quality and condition.

---

* See opinion on rehearing, 85 Neb. ———.

APPEAL from the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*Baldrige & De Bord,* for appellant.

*Francis A. Brogan, contra.*

ROSE, J.

This is a suit by the Fruit Dispatch Company to recover from Bernard Gilinsky the purchase price of a carload of bananas shipped from New Orleans to Council Bluffs. The fruit weighed 21,500 pounds, and the price was $1.70 a hundred weight. The jury rendered a verdict in favor of plaintiff for $396.95, the full amount of its claim and interest. From a judgment for that sum defendant appeals.

The parties disputed over the terms of their agreement. Plaintiff's understanding is that the sale was controlled by the terms of a written contract applicable to all sales to defendant and containing uniform provisions, one of which required him to accept the fruit when delivered to the carrier at the seaboard. Defendant denied the existence of such a contract, and insisted his only obligation was to accept the bananas at Council Bluffs, and pay the purchase price, if they arrived in a green and merchantable condition. They did not so arrive, according to his estimate of their condition, but, on the contrary, as he alleges, were ripe and unmerchantable. He therefore refused to accept the consignment. Plaintiff disclaimed ownership of the fruit at Council Bluffs, and it was sold by the carrier to pay the freight charges. The position of each party is disclosed by facts fully and formally pleaded. Defendant was a wholesale fruit dealer at Council Bluffs. Plaintiff was an importer of tropical fruits, and its method of doing business is partially described in its brief as follows: "The fruit was brought by steamships from tropical countries to the port

of New Orleans, where it was immediately loaded by the Fruit Dispatch Company in cars of the Illinois Central Railroad and other railroads for shipment north and west. The fruit being of a character which would perish and become unsalable, if not handled promptly, the method of marketing and shipment was to obtain sales throughout the territory in which the company operated, through its agents, in advance of the arrival of a shipment. If the entire cargo had been sold in advance in car-load lots, the cars were immediately billed to the different purchasers, at the time of leaving New Orleans. As it could not always be known exactly when a ship-load would arrive, and as the loaded cars were ready to start from the port of New Orleans shortly after the arrival of the ship, it would frequently happen that not all of the carloads would have been sold when the shipment was ready to leave New Orleans. In that case, the cars were started north without a fixed destination, and for each car a bill of lading in duplicate was issued, with the consignee and destination left blank; but the custody of these bills of lading was retained by the agent of the railroad in New Orleans until instructions could be given. Cars shipped in this manner were said to be 'rolling,' and are so referred to in the testimony. It was the purpose of the fruit company to find buyers for these cars before they reached the first diverting point of the railroad, and, when this was done, the office of the fruit company in New Orleans was notified by wire, and thereupon the agent of the railroad was directed to insert the name of the purchaser as consignee and the place of destination. Instructions would then go from the railroad's office in New Orleans to the proper railroad division to divert the car and deliver it according to such instructions."

About 5 o'clock on the morning of November 7, 1906, the shipment in question left New Orleans for the north on the Illinois Central Railroad, but at that time the bill of lading did not disclose the destination of the car or the name of the consignee. Knowing the car was "rolling,"

as that term has been described, defendant by an oral order directed R. B. Thompson, plaintiff's agent at Omaha, to wire plaintiff an offer of $1.70 a hundred weight, November 8, 1906, "if fruit green and in good condition." The order was immediately accepted by plaintiff at New Orleans, and notice thereof was at once communicated to defendant. By direction of plaintiff the name of defendant as consignee was promptly inserted in the bill of lading, which had been previously issued, and it was then mailed to him at Council Bluffs, where he received it November 12, 1906, the date of the arrival of the car. There is proof that the bananas should have reached their destination November 10, and that the delay in transportation may have been sufficient to ripen the fruit. Plaintiff insists that the sale was controlled by the following contract, which appears in the back of a book entitled "Cipher Code and Uniform Conditions Governing Sales for Use in Writing Orders to and Receiving Notifications from Fruit Dispatch Company":

"In conformity with similar announcements heretofore made, the Fruit Dispatch Company has established the following uniform conditions to govern all purchases of bananas and other fruit from it.

"1. All bananas and fruit are sold by the Dispatch Company delivered f. o. b. freight cars at the seaboard, with the exception of special sales provided for in clause No. 11 hereof. After delivery to the carrier at the seaboard all bananas and fruit are at the sole risk of the purchaser. Every order for or sale of bananas or fruit given or made after the same shall have been shipped at the seaboard, shall relate back to the time of such shipment and shall have the same force and effect in every respect as if given or made prior to such shipment.

"2. The certificate of the official weigher, respecting the weight of the bananas or fruit in any given car upon shipment at the seaboard, shall be final and conclusive upon both parties.

"3. Unless the contrary is clearly specified in writing,

every order for bananas or fruit given to the Dispatch
Company shall be understood to contain the request that
a messenger be furnished to accompany the bananas or
fruit purchased for the benefit of the purchaser.  The
Dispatch Company at all times shall have the option of
providing such messenger or not.  Whenever a messenger
shall accompany a car or cars, he will be instructed to
look after the interests of the purchasers, and accordingly
will be subject to all instructions of the purchasers re-
specting their bananas or fruit respectively.  In the ab-
sence of such instructions, the messenger will conform
to the general rules and regulations established by the
Dispatch Company, and to such special orders as the
Dispatch Company may give on behalf of the purchaser
in any case.  The receipt, certificate, or statement of a
messenger respecting the amount, quality, and condition
of the fruit which he is to accompany, given in writing
and signed by him at the time of shipment at the sea-
board, shall be conclusive and final as to all matters
therein contained, upon both the Dispatch Company and
the purchaser.

"4. Any purchaser may furnish his own messenger to
accompany his bananas or fruit, and every such mes-
senger shall have authority to accept bananas and fruit
for the purchaser, and all receipts and statements re-
specting such bananas and fruit, signed by such mes-
senger, shall be binding upon the purchaser.

"5. The Dispatch Company will employ and pay all
messengers furnished by it as aforesaid for account of
the respective purchasers, and hereby guarantees that
the charges to the purchasers for the services of such
messengers shall not exceed one dollar per car to the
respective diverting points established by the Dispatch
Company, and beyond such diverting points shall not
exceed five dollars a day and extra railroad fares, any
fraction of a day in excess of twelve hours being counted
a full day.  Messengers may be paid by the Dispatch
Company, and such payments shall be reimbursed by the

purchasers upon receipt of bills rendered therefor, but the failure of the Dispatch Company to render any such bills or to collect such payments shall not impair or affect any of the terms or conditions hereof. It is further expressly understood and agreed that, without increasing the cost of messengers to the purchasers above the amounts hereinbefore stated, the Dispatch Company may, for the purpose of having suitable messengers ready for service at all times, pay the messengers greater amounts, or may employ them upon salary.

"6. The purchasers shall bear all loss on account of damage or deterioration of bananas and fruit after shipment at the seaboard, arising from any cause whatsoever, and without altering or affecting this provision, the messengers or the Dispatch Company may place any cars of fruit in any store-house or shelter, for the purpose of regulating the temperature or ventilation thereof, or for any other purpose, and in so doing, the Dispatch Company may assume the custody of any bananas or fruit, either directly or through instructions to any messenger, from the carriers temporarily without any liability to the Dispatch Company for anything that may happen or be done to the bananas or fruit in consequence thereof.

"7. The Dispatch Company agrees properly to investigate every claim made as hereinafter provided and will make prompt and fair adjustment thereof, if found meritorious. The purchaser, however, shall in every instance pay to the Dispatch Company the full amount of invoice without any deduction whatever, and shall abide by the decision of the Dispatch Company with respect to any claim, and accept in full satisfaction thereof any allowance made by the Dispatch Company. No such allowance, for whatever cause made, shall have the effect of impairing or affecting any of the provisions hereof, nor shall it constitute any precedent for any future claim.

"8. Notice of every claim against the Dispatch Company must be given to its resident manager at the place where the order was given, immediately after the arrival at its

destination of the car containing the bananas or fruit complained of, and a full statement in writing of the basis of every such claim must be filed with such resident manager within twenty-four hours thereafter. In default of such notice or written statement, the Dispatch Company shall have the option of disregarding any such claim.

"9. All notices of claims filed with such resident managers will be forwarded to the Dispatch Company in New York city for investigation and decision. No representation or agreement made by any resident manager as to the rejection or allowance of any claim will be binding upon the Dispatch Company.

"10. Purchasers shall be bound to pay all freight and other charges from shipment at the seaboard unless a special arrangement shall be made respecting the payment of such freight in any given case, but the assumption or payment of freight by the Dispatch Company shall not affect the delivery at the seaboard as herein provided.

"11. Special sales may be made, after arrival of bananas or fruit at the final destination, to purchasers personally inspecting and accepting the same on the spot.

"12. Every order given to or for the Dispatch Company whether by telephone, telegraph, in writing, or otherwise, shall be regarded as being made under and subject to the terms and conditions herein contained. Every purchase from the Dispatch Company of bananas or fruit, and every sale thereof by it, shall be upon and subject to all the terms, conditions, and provisions herein contained in every respect, unless waived in a writing signed by the president or general manager of the Dispatch Company, it being expressly stated and understood that no officer, employee, or representative of the Dispatch Company, except only the president or the general manager, has any authority to make any contract or sale of bananas or fruit except upon and subject to the said terms, conditions and provisions.

"FRUIT DISPATCH COMPANY,

"By JOHN EVANS, *General Manager.*

"Approved: A. W. PRESTON, *President.*"

"RECEIPT.

"6-28, 1905.

"Received from the Fruit Dispatch Company Code Book No. 605, containing the terms, conditions, and provisions governing purchases from and sales by the Fruit Dispatch Company. The undersigned hereby assents to the same and notifies and directs the Fruit Dispatch Company that every order hereafter given to it or to any of its officers or employees, for the purchase of bananas or fruit, by the undersigned, shall be deemed and construed to refer to and contain the 'Uniform Conditions Governing Sales,' as set forth in the said code book, on pages 55 to 59 thereof, as part of the terms of such order, without any further reference, and hereby further and expressly agrees with the Fruit Dispatch Company that, in consideration of the acceptance from the undersigned of any order or orders for bananas or fruit, all sales of bananas and fruit from the Fruit Dispatch Company to the undersigned, shall be under and subject to the said terms, conditions, and provisions in every respect. The undersigned agrees to return the said code book at any time on demand. Witness the hand and seal of the undersigned the day and year above written. Signed, sealed and delivered in our presence. (Two witnesses.)          B. GILINSKY."

Plaintiff received the foregoing receipt by mail, when it was detached from the matter preceding it, but a copy in blank follows the formal conditions of sale in the back of the code book introduced in evidence. By definite provisions in paragraph 12, the terms of the contract were made applicable to all sales to defendant, and could not be changed or waived except by a writing signed by the president or general manager. There is no proof of such a writing. Defendant insists, however, that he is not bound by any of the terms of the document quoted, and

that the parties never entered into a contract under which he was compelled to accept the bananas. The first point argued in support of the propositions stated, if correctly understood, is that the signing and mailing of the receipt did not make the conditions of sale contractual obligations of defendant. Plaintiff procured the receipt in response to letters mailed to defendant, and the latter insists he is not bound by the contract, because it was concealed in the back of the code book, was not mentioned in plaintiff's letters, and was not embodied in the receipt. The terms of the contract and the manner of procuring it are severely criticised by defendant. Plaintiff's letters, when viewed in the light of the record, do not disclose any element of fraud in procuring the receipt. The letters refer directly to the code book, and its contents is indicated by the following words which appear in bold type on the cover: "Uniform Conditions Governing Sales." Plaintiff's last letter to defendant on the subject contains the following request: "If you are not going to sign the receipt and return it, we will ask that you return both the receipt and the book." During the month of June, 1905, plaintiff wrote defendant three letters in regard to the code book, and forwarded the book itself by registered mail. The hazardous nature of the business of supplying northern markets with perishable fruits from the tropics suggests an honest motive for the repeated demands for the receipt and for the exacting terms of the contract. A contrary motive is not shown by any fact proved. Defendant was a customer of plaintiff. He was a wholesale dealer in tropical fruits, and can scarcely have been ignorant of the methods adopted by plaintiff for its own protection. The receipt itself identifies the contract, and is an acknowledgment that defendant received the code book, that it contained the terms, conditions and provisions governing all purchases by him, and that he assented to the same.

The position that defendant is not bound by the contract because its terms were not made a part of his receipt is also untenable. Parties may make a contract in

writing without inserting all of its terms in a single instrument. A contract may be made by letter. In such a case the material parts of the correspondence constitute the agreement of the parties, and all writings on the same subject should be construed as one instrument. *Collyer v. Davis*, 72 Neb. 887. It is not necessary that both parties act at the same time. *Esmay v. Gorton*, 18 Ill. 483. For the purpose of identifying a written instrument and of accepting the terms thereof, a receipt may perform the office of a letter.

Defendant further insists that he never saw the letters; that he did not know of the existence of the contract when he was sued; that he never signed the receipt; that he did not authorize any one to sign it for him, and that his name was used without authority. Defendant's name was signed to the receipt by his son Sam, but it is urged that the latter acted without knowing the contents of the code book and without the knowledge or consent of his father. That defendant was bound by the act of his son was shown by a general verdict, as well as by a special finding. The trial court submitted to the jury this interrogatory: "Do you find from the evidence that the contract contained in the code book and the receipt for the same were executed by the defendant through his son, Sam Gilinsky, as his agent?" "Yes" was the answer of the jury, and it settles that question, if the finding is supported by sufficient evidence. Defendant could not read or write the English language. Much of his correspondence was entrusted to his son, who was a high school graduate. Defendant placed him in his store, where he was permitted to open and answer mail, and where he participated in his father's business. In his own brief defendant says: "Sam was a clerk in his father's place of business, buying a car of fruit now and then, and once did write to the Dispatch Company that he was authorized to do some buying." In the position in which defendant placed his son, the latter received and answered a letter containing a demand for the receipt for the code book. In that position he signed

his father's name to the receipt. This is at least some evidence, in connection with surrounding circumstances, that the son had apparent authority to act for his father in the manner in which he did act. In reply to letters directed to defendant at his regular place of business, plaintiff procured the receipt by due course of mail, and had a right to presume the letters were answered and the receipt signed by the person addressed, there being nothing to indicate the contrary. *Violet v. Rose,* 39 Neb. 660; *People's Nat. Bank v. Geisthardt,* 55 Neb. 232; *Helwig v. Aulabaugh,* 83 Neb. 542. There is evidence that one of plaintiff's agents was informed by defendant that the son was "running the banana end of the business." In relating what took place between one of plaintiff's agents and defendant as to purchasing a car of fruit, defendant testified: "I said my son is outside. Go and talk with him. If he wants to buy, it is all well and good." It was also shown by documentary and oral proofs that, pursuant to the terms of the contract quoted, a claim for damaged fruit was made out by the son in the name of defendant and paid in full by plaintiff. An examination of the entire record leads to the conclusion that there is sufficient evidence to sustain a finding that the son had apparent authority to act for defendant, and that his conduct affected plaintiff as an innocent third party, within the meaning of the rule that "a principal is bound by the acts of his agent, not only when performed within the scope of his actual or implied authority, but when within the scope of apparent authority conferred upon him by the principal." *Johnston v. Milwaukee & Wyoming Investment Co.,* 46 Neb. 480.

The original contract in writing and the oral order for the car of fruit were Iowa contracts, and to defeat a recovery defendant pleaded, and now urges. the Iowa statute of frauds as a defense. He also insists there was no delivery to him. These points will be considered together. Under the statute of Iowa contracts which must be in writing and signed by the party charged include "those in

relation to the sale of personal property, when no part of the property is delivered and no part of the price is paid." Defendant did not sign a written memorandum in ordering the fruit, and asserts there was no delivery to him within the meaning of the foregoing provision. He therefore concludes the case is within the Iowa statute of frauds. Whether this point is well taken depends upon the question of delivery. If delivery to the carrier was delivery to defendant, or if the fruit, after delivery to the carrier, was transferred to defendant by the bill of lading when plaintiff accepted the order, the case is not within the Iowa statute. In *Leggett & Meyer Tobacco Co. v. Collier*, 89 Ia. 144, the supreme court of Iowa said: "In the case at bar there was no undertaking by the vendor to deliver the goods at the place of business of the defendant firm, nor did the vendee designate a special carrier by whom the delivery should be made. In the absence of such designation and undertaking, the rule is that a delivery to the common carrier, in the usual and ordinary course of business, transfers title and possession of the property to the vendee, subject, as we have said, to the exercise by the vendor of the right of stoppage in transit. * * * It is said that there was no acceptance of the goods, and hence the case is within the statute of frauds. Under our statute, the delivery of goods under a contract of sale, to a common carrier in the usual course of transportation, is sufficient to take the case out of the statute. Code, secs. 3663, 3664. In this respect our statute seems to be different from that of New York, where both delivery and acceptance are required."

The statute and opinion cited were introduced in evidence, and control the decision on this branch of the defense. The name of defendant as consignee was inserted in the bill of lading November 8, 1906, and it was promptly mailed to him upon receipt of his order. A messenger who was in charge of the car testified the bananas on that date were green and in good condition, and that the temperature of the car was properly regulated. His report was

introduced in evidence, and shows the same facts. The first paragraph of the contract, containing the uniform conditions governing sales, provides: "After delivery to the carrier at the seaboard all bananas and fruit are at the sole risk of the purchaser. Every order for or sale of bananas or fruit given or made after the same shall have been shipped at the seaboard, shall relate back to the time of such shipment and shall have the same force and effect in every respect as if given or made prior to such shipment." The law applicable to the proofs and contract is well settled. *Mobile Fruit & Trading Co. v. McGuire,* 81 Minn. 232, was a suit to recover the balance of the purchase price of a car of bananas shipped from Mobile, Alabama, to St. Paul, Minnesota. Green and fancy bananas were ordered by wire. When delivered to the carrier at Mobile, the fruit was green and fancy, but did not arrive at St. Paul in that condition. The consignee refused to pay the purchase price in full, on the ground that his order required delivery of the fruit in a green and fancy condition at St. Paul. The consignor insisted that delivery to the carrier at Mobile was delivery to the consignee. In sustaining a recovery for the balance of the purchase price, the supreme court of Minnesota announced the following rule: "If no place of delivery is specified in the contract of sale, and there are no circumstances showing a different intent, the general rule is that the articles sold are to be delivered at the place where they are at the time of the sale, and that their delivery to the proper carrier is a delivery to the buyer, and that the title passes to him subject to his right of inspection and rejection of the goods on arrival, if found not to be in accordance with the contract. The buyer, however, unless otherwise agreed, assumes the risk of deterioration in the goods necessarily incident to the course of transporation."

The general rule that, in absence of an agreement to the contrary, a delivery to the carrier is a delivery to the consignee has been announced by this court. *Butts v.*

56

*Hensey*, 73 Neb. 421; *McKee v. Wild*, 52 Neb. 9; *Havens & Co. v. Grand Island Light & Fuel Co.*, 41 Neb. 153. It follows that plaintiff's recovery was not defeated by the Iowa statute of frauds, and that the facts proved in connection with the agreements of the parties warrant the conclusion that there was a delivery to defendant as early as November 8, 1906, when the fruit was green and in a good condition, as ordered.

Some of the instructions are criticised as conflicting, and others as containing repetitions prejudicial to defendant. Other rulings of the court in giving and in refusing instructions are also assigned as error. A discussion of these questions separately would make the opinion too long, but all such rulings have been carefully considered in connection with the entire charge. The result of the investigation is that no error requiring a reversal of the judgment of the trial court has been found.

AFFIRMED.