MARTIN J. BARRETT, APPELLEE, v. NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, APPELLANT.

FILED MAY 12, 1933. No. 28572.

*Montgomery, Hall & Young,* for appellant.

*Gray & Brumbaugh, contra.*

Heard before GOSS, C. J., ROSE, DEAN, EBERLY and PAINE, JJ.

PAINE, J.

This was an action brought to recover premiums, alleged to be wrongfully and fraudulently collected by the defendant company from plaintiff from August, 1924, to December, 1930, on a life insurance policy providing for waiver of premiums in the event of total disability. At the close of the evidence, both parties moved for directed verdicts. The jury were discharged, and judgment was awarded plaintiff for $3,515.68 and attorney's fee of $300. Defendant appeals.

On August 15, 1916, defendant issued a policy for $10,-000 to the plaintiff, who was born September 15, 1877,

and was 39 years of age when the policy was issued. The policy was a 20-payment life policy, with annual premiums of $401.70, the beneficiary in said policy being his wife, Marie A. Barrett. Attached to said policy was a rider, issued the same date, which provided that, for an extra premium of $3.60 annually, the defendant would waive premiums in the event of total disability of the insured before attaining 60 years of age. While the policy, including the said rider, was in full force and effect, the plaintiff, in August, 1922, was advised by his physician, Dr. O'Connor, of Omaha, Nebraska, that he had a carcinoma of the bowels and rectum, and that his only chance of living was an immediate operation, and advised him to be operated upon at Rochester, Minnesota, which advice he followed. Dr. Charles Mayo performed a colotomy in August, 1922, in which the abdomen was opened and the intestine was pulled out to the surface, and a new exit made about four inches to the left of the umbilicus, and the intestine from that point downward was removed from the plaintiff. In September, 1922, Dr. Mayo followed this with the Kraske operation, in which he removed the coccyx and several vertebræ, constituting the lower end of the spinal column, so as to be able to remove all of the cancer.

In July, 1923, the plaintiff attempted to work at the Burlington postal station for a day or so, but was seized with severe hemorrhages of the bowels and pain, and was required to go to bed, and, although he tried thereafter on several occasions to work for a day at light work, severe hemorrhages and pain followed every such exertion, as is customary following these two operations, and he has been confined to his bed more or less continuously, and has been totally disabled physically, since the operations which took place in 1922.

In August, 1923, the premium again became due. Plaintiff's wife, who acted as his agent, and was the beneficiary in the policy, went to the office of Franklin Mann, who had been general agent of the defendant company

in Nebraska for some 20 years, having 135 to 140 agents under him, to arrange for a loan on the policy to pay the premium. She transacted all of this business with Miss B. Marie Petersen, who was the assistant cashier, and who had authority to make loans on policies, who dictated correspondence, and signed the same by attaching Franklin Mann's name thereto with a rubber stamp, and attended to as high as 50 customers a day. Miss Petersen arranged for a loan on the policy, and required that the policy be surrendered to her as collateral security, and neither the plaintiff nor his wife have seen the policy since that time.

Two or three weeks before the premium became due in August, 1924, the plaintiff's wife went to the same office, and was again waited upon by Miss Petersen, and she testified as follows: "Mr. Barrett's policy provided for waiver of premium, and I had come in to have the premiums waived; I told her Mr. Barrett had two severe operations sometime ago that had left him a permanent invalid, and he had waited this long hoping he would regain his health, and be able to work again, but each time he got worse, and I told her there was a premium coming due in a short time, and we wanted the company to take care of it before it became delinquent. She said, 'Is he confined to his bed?' and I said, 'A good share of the time,' and she said he would have to be confined to bed all the time and hardly able to move a muscle, just the same as being paralyzed. I said, 'What are we paying $3.60 for?' I said, 'It was our understanding that any time he became disabled, at any time, the premium would be waived,' and she said, 'Oh, no; he would have to be bedfast all the time.' " That plaintiff's wife returned home and reported this conversation to the plaintiff, and that he, relying on the statement of Miss Petersen, assistant cashier, as properly reflecting the terms of the policy, borrowed more money on the policy to pay the premium due August 15, 1924.

In February, 1926, plaintiff's wife again went to the

office of the general agent of defendant, and Miss Petersen, assistant cashier, again waited upon her. Mrs. Barrett said that she was there again to see if the premium on the policy could not be waived, because they were so hard up and he was not able to work at all. Miss Petersen took Mrs. Barrett into Mr. Mann's office. This was the first time that she had met him, and she told Mr. Mann that Mr. Barrett had not been able to work for four years, and that she wanted to see about waiving the premiums on the policy. After getting the card on Mr. Barrett's policy and figuring a little while, she testifies that Mr. Mann answered that there might be a little gain from changing it from a 20-payment policy to an ordinary life, and that, before he could say anything definite, he would have to see the policy and go over it thoroughly, and that he would write to her, with which statement she was dismissed from the office. Exhibit No. 4, dated February 15, 1926, is a copy of the letter Mr. Mann wrote plaintiff, in which he says that the loans have so reduced the value of the policy that it would be impracticable to make the change from a 20-payment policy to an ordinary life policy, and closed with the sentence: "About the only thing to be done if the coverage is to be preserved is to pay the premium." Nothing in the letter refers to the only question she asked him, which was, how to get premiums waived after four years of total disability, and this subject he entirely avoided. She testifies that, neither on this occasion, nor the occasion of her conversations with Miss Petersen, did either Miss Petersen or Mr. Mann give her any blanks to fill out on his total disability. That later on in 1926, the plaintiff was compelled to pay the premium due in cash, because there was not enough money on the policy that could be borrowed. Again, in the spring of 1930, plaintiff's wife went to the office of the defendant company, and Miss Petersen, to whom they had paid the premiums, again waited upon her, and she testifies that she said to Miss Petersen, "Why do we have to pay premiums on Mr.

Barrett's insurance? * * * Nearly all winter he has been in bed all day long, except a short time in the evening when he was too tired, and would sit up;" and she further testified that she said to Miss Petersen, "I know a person not nearly so bad as Mr. Barrett and they didn't have to pay premiums any more," and she testifies that Miss Petersen replied, "Oh, well, some companies have clauses in their policy that ours do not have," and Mrs. Barrett testifies that she relied upon Miss Petersen's statements as to what the disability clause in plaintiff's policy contained.

Plaintiff's wife testifies that about the 1st of December, 1930, after receiving information from Mr. Gwin, an insurance agent, she went to the office of Mr. Mann and demanded and received blanks on which to file a claim for waiver of premium. It was stipulated between the parties that, between the dates August 9, 1924, and August 14, 1930, the total premiums paid by the plaintiff amounted to $2,596.23, without interest. The plaintiff, in his testimony, corroborated the testimony of his wife.

The defendant introduced the Miss B. Marie Petersen heretofore referred to, who, at the time she testified, was Mrs. Marie Burmester, having married the cashier of the defendant company. She testified that she did not remember Mrs. Barrett coming to the defendant's office in reference to the plaintiff's policy, nor remember her paying premiums thereon, or consulting with her in reference to loans on the policy, and testified that she had never seen Mrs. Barrett prior to the time she saw her in the courtroom. Upon cross-examination, Mrs. Marie Petersen Burmester admitted that, in a deposition taken in April, 1931, she was asked this question, "Do you know Mrs. Barrett?" and that she made the answer, "Just as she has come in the office," and, when asked if the answer was correct, her answer was, "After this trial started, I remember that she came in and asked for Mr. Mann," but that she had never been in the office before to her knowledge. She was also asked the question, in

reference to her deposition taken a few days after suit had been filed, "Then, the question, 'Have you known her a year?' and the answer, 'Well, it would be hard to say. You understand my position was taking care of the counter; sometimes there would be as high as fifty a day; they make inquiries as to their policies, securing loans, applications, and their signatures, and I take care of them.' Do you recall that question being asked and that answer being given? A. Yes, sir." The witness also testified that, if Mrs. Barrett had asked her about the total disability clause, she would have given her a blank to complete and send to the company; that she had blanks right there for that purpose. On further cross-examination, exhibit No. 5, being a note for a loan, signed by plaintiff and his wife, was shown her for the purpose of refreshing her recollection, and she admitted that she had signed her name as a witness opposite each of their signatures, but she said she could not remember the transaction otherwise. Upon further cross-examination for the purpose of refreshing her recollection, she was asked about an interview at her office with plaintiff's wife in 1923 or 1924, in which Mrs. Barrett had asked about the cost of a 20-payment or ordinary life policy for her son, who was at that time 19 years of age, and she was handed exhibit 6, which was a memorandum, written in lead-pencil on the back of an insurance circular to agency forces, reading: "Ord. Life 18$^{76}$ at 1000. 20-P- Life 28$^{73}$." She denied that she remembered this exhibit, and denied that she had made out the statement, exhibit 6, from a book on her desk, and claimed to have no recollection of the transaction.

Mr. Franklin Mann, the general agent, testified that he never met Mrs. Barrett until 1930, nor did he recall having the conversation with her to which she testified, although he admitted on cross-examination it might have been possible. He testified that his letter, exhibit 4, was not in response to a conversation with her in his office, but was in response to a telephone conversation. Mr.

Barrett, upon being recalled to the stand, testified that he had never had a conversation with Mr. Mann over the telephone in his life.

At the close of the defendant's evidence, each party made a motion for a directed verdict. The jury were thereupon discharged, and the court, in discharging the jury, said that the case involves a question of law, and told the jury that there was no dispute about the fact that Mr. Barrett had been totally disabled since 1922, after the operation, and that the question is, whether or not proper proof has been made, or whether the company has waived proof of the total disability, and, therefore, that it did not leave anything for the jury to decide, and thereupon the court entered judgment, as prayed by the plaintiff.

1. The first question arising in this case is whether Miss Petersen, the assistant cashier of the defendant company, to whose desk the general public came to pay premiums, and received their receipts, to make loans on their policies, to sign legal instruments relating to the business of the company, is an agent of such company, and whether her statements will bind the company.

In the chapter on insurance, Comp. St. 1929, we find section 44-307 defines the term "agent," as relates to the case at bar, as any person who shall, with authority, receive or receipt for any money from other persons on account of, or for, any contract of insurance. Under the broad definition of this section of our statute, there can be no doubt that Marie Petersen was an agent of the defendant company.

A company has been held to be bound by the acts of an agent, in excess of actual authority granted, where it negligently permits such agent to so operate as to cause third persons, dealing with the agent in good faith, to believe him possessed of the powers exercised. *Mangiameli v. Southern Surety Co.*, 111 Neb. 801; *Creighton v. Finlayson*, 46 Neb. 457; *Holt v. Schneider*, 57 Neb. 523; *Fruit Dispatch Co. v. Gilinsky*, 84 Neb. 821.

2. . Even if a policy stipulates for satisfactory proof, the company cannot demand proof other than what is reasonable and just, and such a provision should be considered as complied with when there has been furnished such proof as establishes the fact of the loss and the right of the claimant to recover. One court has even held, in a fire insurance case, that verbal notice of a loss to the company's local agent was sufficient under a policy requiring due notice and satisfactory proofs.

Waiver by denial of liability is based largely upon the principle that the law does not require a vain, useless, or unnecessary thing. The general rule is that a denial by the insurer, or its authorized agent, of liability under its policy, or any act or artifice to mislead the insured, and cause him to omit to perform a duty he would otherwise have performed, will operate as a waiver of a provision requiring proof. In fact, to effect a waiver by a denial of liability on the part of the insurance company, the denial must be of such a character, or made under such circumstances, as reasonably to induce the belief that the submission of proofs will be useless. Nor need the denial be express or unequivocal, it being sufficient that the facts and circumstances warrant the inference that liability was, and would be, denied. The insured may not be deprived of his rights by a narrow and technical construction of formal requisites, by which that right is to be made available. On the contrary, a liberal and reasonable construction should be given. Couch, Cyc. of Ins. Law, secs. 1541, 1573, 1589; *Robinson v. Pennsylvania Fire Ins. Co.,* 90 Me. 385; *Minnesota Mutual Life Ins. Co. v. Marshall,* 29 Fed. (2d) 977; *Ward v. Pacific Fire Ins. Co.,* 115 S. Car. 53; *Killips v. Putnam Fire Ins. Co.,* 28 Wis. 472; *Security Ins. Co. v. McAlister,* 90 Okla. 274; *Wilkinson v. Standard Accident Ins. Co.,* 180 Cal. 252; *Sinincrope v. Hartford Fire Ins. Co.,* 201 N. Y. Supp. 615; *Norfolk Packing Co. v. American Ins. Co.,* 120 Neb. 19; *Farrell v. Farmers & Merchants Ins. Co.,* 84 Neb. 72; *Brinton v. Grand Lodge, A. O. U. W., ante,* p. 680.

3. The gist of the plaintiff's case is that Miss Petersen, assistant cashier of defendant company, who knew that she had sent in plaintiff's policy as collateral to loans, and that plaintiff did not have the policy, or the total disability rider attached thereto, at the time she was served with oral notice and oral proof of the operations which totally disabled plaintiff, knowingly and fraudulently concealed from plaintiff the nature, character, and amount of proof required under the total disability rider, with which she was familiar, and knowingly and fraudulently advised plaintiff's wife that, to be entitled to a waiver of premiums, plaintiff "would have to be confined to bed all the time and hardly able to move a muscle, just the same as being paralyzed;" that she knew said information was false, and plaintiff, not having his policy, or said total disability rider, in his possession, believed and relied upon such statement of defendant's agent, knowing that she knew the facts in relation thereto, and was damaged at least by the amount of the payments on premiums he was thereby unnecessarily compelled to make.

It is clear that the defendant's agent wrongfully advised the plaintiff, with the design of influencing him from filing the proper claim, to the advantage of the defendant company. Plaintiff was misled, to his detriment, by the insurer's conduct.

"Insurance companies, doing business by agencies at a distance from their principal place of business, are responsible for the acts of the agent, within the general scope of the business entrusted to his care, and no limitation of his authority will be binding on parties with whom he deals which are not brought to their knowledge." *Forward v. Continental Ins. Co.*, 142 N. Y. 382, 25 L. R. A. 637.

And a principal, in equity and good conscience, should not be allowed to retain the benefits derived from fraudulent conduct of its agent. *Dresher v. Becker*, 88 Neb. 619; *Tylee v. Illinois C. R. Co.*, 97 Neb. 646; *Gough v.*

*Halperin,* 306 Pa. St. 230; *Newberg v. Chicago, B. & Q. R. Co.,* 120 Neb. 171.

The plaintiff insists that the fraudulent conduct of the defendant's agents, and his belief and reliance thereon, prevented the furnishing of other and additional proof, which was at all times available, and without question would have complied with the technical requirements of the company.

A careful reading of the total disability rider, attached to this policy, does not disclose that the proof required must be in writing, or upon any particular blank, but provides only that it must be proof satisfactory to the company, and a distinct denial of liability by an agent of the company is a waiver of such proof.

In the evidence in this case, it is not simply the evidence of Miss Petersen and Mr. Mann against the plaintiff and his wife, but the circumstantial evidence and the exhibits all clearly support the evidence of plaintiff, and the district court was right in finding the evidence sustained the plaintiff's allegations.

In this case, a man in his prime purchased a $10,000 life insurance policy, and, in addition, by the payment of an additional sum, purchased a total disability rider, which provided that the premiums would be waived if he suffered total disability. Six years after the policy was taken out, he discovered that he was a victim of cancer, and the severe operations, which barely saved his life, left him totally disabled physically. By the greatest sacrifice, he paid the premiums during these years, upon the representation of an agent of the company that his condition was not serious enough to warrant the company in waiving the premiums. Other errors alleged are not prejudicial and will not be discussed.

The terms of an insurance policy are to be construed liberally, and the facts and the law in this case entirely justify the trial court in entering a judgment requiring the premiums paid during those years to be returned to the insured, with 7 per cent. interest. The judgment is

therefore affirmed, and an additional attorney's fee of $200 is to be entered as part of the costs in this court.

AFFIRMED.