DUTTON-LAINSON COMPANY, A NEBRASKA CORPORATION, APPELLANT AND CROSS-APPELLEE, V. THE CONTINENTAL INSURANCE COMPANY, A CORPORATION, AND UNITED STATES FIDELITY AND GUARANTY COMPANY, A CORPORATION, APPELLEES, AND NORTHERN INSURANCE COMPANY OF NEW YORK, A CORPORATION, AND EMPIRE FIRE AND MARINE INSURANCE COMPANY, A NEBRASKA CORPORATION, APPELLEES AND CROSS-APPELLANTS.

716 N.W.2d 87

Filed June 23, 2006.    No. S-04-1223.

James W.R. Brown, Thomas R. Brown, and Steven J. Olson, of Brown & Brown, P.C., L.L.O., for appellant.

Thomas J. Culhane and John B. Morrow, of Erickson & Sederstrom, P.C., and Peter B. Kupelian, of Kupelian, Ormond & Magy, P.C., for appellees Northern Insurance Company of New York and Empire Fire and Marine Insurance Company.

Robert S. Keith and Kellie R. Harry, of Engles, Ketcham, Olson & Keith, P.C., and Eileen King Bower and Julie L. Burgener, of Ross, Dixon & Bell, L.L.P., for appellee The Continental Insurance Company.

Stephen L. Ahl, of Wolfe, Snowden, Hurd, Luers & Ahl, and Frank Winston and John R. Casciano, of Steptoe & Johnson, L.L.P., for appellee United States Fidelity and Guaranty Company.

Randall L. Goyette, of Baylor, Evnen, Curtiss, Grimit & Witt, and, of Counsel, Laura A. Foggan, John C. Yang, and Mariela Olivares, of Wiley, Rein & Fielding, L.L.P., for amicus curiae Complex Insurance Claims Litigation Association.

HENDRY, C.J., WRIGHT, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## I. NATURE OF CASE

The plaintiff, Dutton-Lainson Company (Dutton), incurred costs and expenses relating to the cleanup of environmental damage as demanded by the U.S. Environmental Protection Agency (EPA). In this action, Dutton is suing several of its

liability insurers for indemnification of those costs and expenses. Summary judgment was granted in favor of the insurers, and Dutton appeals.

## II. STATEMENT OF FACTS

Dutton is a Nebraska corporation with its principal place of business in Hastings, Nebraska. Since at least 1948, Dutton conducted a manufacturing business. In the course of its manufacturing operations, Dutton used various solvents to clean its machines and parts. From approximately 1948 to 1971, the cleaning solvents contained trichloroethylene (TCE). From approximately 1971 to 1985, the solvents contained "1,1,1, trichloroethane" (TCA).

From February 1962 to October 1964, Dutton placed the solvents and some sludge-filled degreaser fluid in sealed metal drums and deposited the solvents and drums in the North Landfill in Hastings, which was operated by the city of Hastings. From October 1964 to July 1982, Dutton placed sludge from the degreaser and, prior to September 7, 1977, some of the sludge-filled solvent fluid in sealed metal containers and deposited them in the South Landfill in Hastings, which was also operated by the city of Hastings.

At some point after the drums and containers were deposited in the North and South Landfills, either the solvent and sludge in the drums and containers were emptied into the landfills or the operator of the landfills bulldozed the materials and crushed the containers, causing the sludge and solvent "to be removed from" the containers. This was done either directly by Dutton employees or by the landfill operators with full knowledge of Dutton. Commencing prior to 1970 and continuing past 1987, the TCE and TCA deposited by Dutton in the North and South Landfills seeped into the soil and ground water at both subsites.

In addition to the North and South Landfills contaminations, from 1948 to 1987, Dutton's regular manufacturing operations caused solvents containing TCE and TCA to spill onto the concrete floor of its operating premises. The TCE and TCA seeped from the concrete floor into the ground water beneath and continued to spread to the ground water under adjacent property. The pollution emanating from such seepage is designated as "Well No. 3." Dutton presented evidence that until it received a

letter from the EPA in 1992, it was unaware that the solvent was migrating through the concrete floor and invading the soil and ground water.

The evidence is undisputed that Dutton's deposits in the North and South Landfills were in compliance with then-existing laws and ordinances for the disposition of these solvents and that Dutton did not anticipate that the solvents would cause pollution of the soil or ground water.

Throughout its manufacturing operations, Dutton carried several insurance policies with multiple insurers. United States Fidelity and Guaranty Company (USF&G) issued the following policies to Dutton: policy No. MP8393 (effective November 15, 1973, to November 15, 1976), policy No. MP9379 (effective January 1, 1977, to January 1, 1980), and policy No. MP20284 (effective January 1, 1980, to January 1, 1983). Empire Fire and Marine Insurance Company (Empire) issued a commercial umbrella policy, No. 280381, to Dutton for the policy period January 1, 1978, to January 1, 1979. Both the USF&G policies and Empire's policy contained pollution exclusion clauses which provided that the insurance did not apply

> to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(Such pollution exclusion clauses are hereinafter referred to as the "qualified pollution exclusion.")

Continental Insurance Company (Continental) issued three primary general liability policies to Dutton as follows: policy No. CBP415666 (apparently effective August 1, 1980, to August 1, 1983), policy No. CBP914504 (apparently effective August 1, 1981, to August 1, 1984), and policy No. CBP900212 (effective October 1, 1984, to October 1, 1987). Northern Insurance Company of New York (Northern) issued a commercial general liability policy, No. SM37686395, for the period October 1, 1983, to October 1, 1986. However, this policy was canceled by Dutton effective October 1, 1984.

The Continental policies contained an addendum stating: "It is hereby agreed and understood that the Comprehensive General Liability Insurance . . . is amended to include Bodily Injury or Property Damage caused by the dumping, discharge, or escape (sudden or non-sudden), of irritants, pollutants, or contaminants." Northern's policy's standard form contained a pollution exclusion clause identical to the one found in the USF&G and Empire policies; however, pursuant to negotiations between Dutton and Northern, the pollution exclusion clause was deleted from the policy.

On September 23, 1985, the EPA notified Dutton that it was a potentially responsible party (PRP) for the cost of cleaning up the contamination at the North and South Landfills and of the contamination that had emanated from those subsites. On November 5, 1992, the EPA notified Dutton that it was a PRP for the cost of cleaning up the contamination at the Well No. 3 subsite and of the contamination that had emanated from that subsite. On December 28, 2001, Dutton was notified by the EPA that it was a PRP for "Operable Unit 19," which was an area-wide ground water contamination subsite allegedly contaminated in part by the leaching of the North and South Landfills and Well No. 3, which leaching had not been addressed by the other subsite response actions.

The PRP notices from the EPA generally gave Dutton a specified period of time to voluntarily undertake cleanup of the relevant subsites, or else the EPA would design and implement its own plan and would collect reimbursement from Dutton in the event it were ultimately determined to be a PRP. Beginning August 14, 1998, consent decrees were entered between Dutton and the EPA regarding cleanup of the various subsites. Pursuant to these decrees, Dutton has conducted extensive cleanup, with such efforts still continuing.

In November 1985, Dutton notified Continental, Northern, USF&G, and Empire of the EPA's designation of Dutton as a PRP for the North and South Landfills. Dutton updated its notice to Continental in 1991 and to USF&G in 1992.

Continental first responded to Dutton's notice in February 1987 with a strict reservation of rights, "because there is a possibility, and even a good likelihood that no coverage existed

under our policies for the pollution occurring near Hastings, Nebraska. Coverage might be eliminated by exclustions [sic] listed in our policy." In February 1992, Continental sent a letter to Dutton stating that "[u]pon review of both the documentation provided with your submission of this claim and the above referenced policies, Continental must respectfully deny coverage for this claim . . . ." The letter then set forth several reasons for such denial. As Continental admitted during oral argument to this court, "the denial was clear."

Northern, through its parent company, Maryland Casualty Company, responded to Dutton's notice in April 1986. Therein, Northern stated that it did not believe that any "suit" within the meaning of the policy had yet been brought. Therefore, "any determination as to coverage would appear to be premature." Yet, Northern went on to state that coverage sought by a future suit might be inconsistent with the definitions of "occurrence" and "property damage," as well as other provisions. In closing, Northern stated that it "would appreciate . . . being kept apprised of the progress of EPA's investigation, and would welcome any future information that you believe relevant." At oral argument, Northern's attorney admitted that the 1986 letter "could be fairly read as being a refusal."

Empire responded to Dutton's notice in 1992. Characterized as an "interim response," Empire stated that based on the information it had, the losses for which Dutton sought coverage did not appear to be derived from an "occurrence," as defined by the policy, and that moreover, the claim against Dutton did not involve "damages," as required by the policy. Empire also cited several policy exclusions which would apply to bar Dutton's claim, including the qualified pollution exclusion. Empire closed that it "invite[d] [Dutton] to furnish [it] any information which might bear upon the question of coverage." It further stated that it would "continue to monitor the matter through [USF&G]."

USF&G first responded to Dutton's 1985 notice with an acceptance of the notice with a strict reservation of all rights and defenses under any and all policies in effect between USF&G and Dutton, noting that there was a "likel[i]hood" that no coverage existed for the pollution due to policy exclusions and the fact that the damages did not manifest themselves until 5 years

after the time Dutton's policy with USF&G was last in effect. The letter did not request any further information from Dutton. The next communication between Dutton and USF&G occurred around November 26, 1991, when Dutton's counsel wrote to Dutton's insurance broker regarding the pollution-related claims asserted against Dutton, and the broker then forwarded this letter to USF&G. In response, USF&G sent a letter dated April 6, 1992, to Dutton stating its reservation of rights and setting forth numerous reasons why there was likely no coverage. However, USF&G asked that Dutton forward specified information to it. No response was received from Dutton, and the next contact between Dutton and USF&G was a letter dated May 11, 1993, when USF&G wrote to Dutton requesting an update of the status of the claims. Again, USF&G received no response and did not hear again from Dutton until the current action was filed.

Dutton filed suit against Continental, Northern, USF&G, and Empire on September 4, 2002, seeking indemnification for sums expended in connection with defending against the EPA's investigation and the resulting environmental cleanup, for attorney fees, and for a declaratory judgment that the insurers, subject to the policy limits, are liable for any future expenditures with respect to the North and South Landfills, Well No. 3, and Operable Unit 19. Continental's answer set forth 29 affirmative defenses, including the statute of limitations, laches, and late notice. Northern similarly responded with 37 affirmative defenses, including the statute of limitations, laches, and failure to provide timely and proper notice as required by the policy. USF&G set forth 13 affirmative defenses, but did not plead the statute of limitations or laches. It did plead late notice and the qualified pollution exclusion contained in the policy. Empire asserted 37 affirmative defenses, including the statute of limitations, laches, late notice, and the qualified pollution exclusion.

Northern, USF&G, and Empire made general motions for summary judgment, and Continental filed a motion for summary judgment based upon the statute of limitations and laches. Dutton responded by filing a "Motion for Partial Summary Judgment," asking that the court determine that (1) under each of the policies, each defendant had breached its duty to indemnify Dutton; (2) Continental, Northern, and USF&G each breached its duty to

defend Dutton against the EPA proceedings and therefore could not later contest coverage under the policies; (3) all defendants were jointly and severally liable to Dutton for the amounts it had expended pursuant to administrative orders on consent of the EPA and to consents it had executed for entry of consent decrees in the U.S. District Court for the District of Nebraska, the amounts of which remained to be determined; (4) all defendants were jointly and severally liable for any other cleanup costs Dutton had paid and all defense costs it had incurred, the amounts of which remained to be determined; (5) defendants were jointly and severally liable for interest on cleanup and defense expenses at a rate of 12 percent per annum; (6) defendants were jointly and severally liable for reasonable attorney fees; and (7) defendants were jointly and severally liable to pay to Dutton all cleanup costs thereafter required to be expended by Dutton for the cleanup of the North and South Landfills, Well No. 3, and Operable Unit 19, and for all future monitoring and maintenance expenses with respect thereto, with interest at a rate of 12 percent per annum from the date of payment by Dutton.

The district court granted summary judgment in favor of all four defendants. As to USF&G and Empire, the court found the pollution to be excluded under the pollution exclusion provision of the policies. The court reasoned that the terms "sudden" and "accidental" were unambiguous and that regardless of the fact that Dutton may not have anticipated the pollution that occurred as a result, the leakage from the Dutton plant over a period of 17 years and spillage for a period of 29 years were neither "sudden" nor "accidental." As to Continental and Northern, and as an additional basis for summary judgment in favor of Empire, the court determined that the statute of limitations barred Dutton's claims. The court further found that laches barred Dutton's claims against Continental and USF&G and that "late notice" defeated Dutton's claims against Northern and USF&G. The district court denied Dutton's motion for partial summary judgment.

## III. ASSIGNMENTS OF ERROR

Dutton assigns, consolidated and restated, that the district court erred in (1) sustaining Empire and USF&G's motions for summary judgment on the ground that coverage was precluded

by the pollution exclusion; (2) sustaining summary judgment in favor of Continental, Northern, and Empire on the basis of the statute of limitations; (3) sustaining summary judgment in favor of Continental and USF&G on the basis of laches; (4) sustaining summary judgment in favor of Northern and USF&G on the basis of "late notice"; and (5) failing to grant Dutton's motion for partial summary judgment.

Northern and Empire cross-appeal, asserting that the district court erred in (1) not including Empire in its determination that because of late notice, no coverage is available to Dutton with regard to the Well No. 3 subsite and Operable Unit 19, and (2) not sustaining Northern's and Empire's motions for summary judgment based on laches.

## IV. STANDARD OF REVIEW

The interpretation of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination made by the trial court. *Molina v. American Alternative Ins. Corp.*, 270 Neb. 218, 699 N.W.2d 415 (2005).

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006).

## V. ANALYSIS

### 1. QUALIFIED POLLUTION EXCLUSION

We first address the qualified pollution exclusion clause found in Dutton's policies with USF&G and Empire. USF&G and Empire assert that under the undisputed facts of the case, the qualified pollution exclusion released them from any liability to defend or indemnify Dutton for expenses relating to the EPA investigation and consent judgments against it. Dutton, in contrast, argues that the "sudden and accidental" exception to the pollution exclusion applies so as to make such exclusion inapplicable. The district court determined that because it was undisputed that the discharge occurred over a long period of time,

there was no material issue of fact and as a matter of law, the pollution in question was neither sudden nor accidental, and that the exception to the exclusion did not apply. Inherent to this determination was the district court's interpretation of the phrase "sudden and accidental."

■ Courts that have considered the qualified pollution exclusion here presented have generally held that while the burden rests with the insurer to establish the initial applicability of the pollution exclusion by showing the discharge or release of a pollutant into the environment, the burden then shifts to the insured to show that the "sudden and accidental" exception to that exclusion is applicable. See, *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98 (6th Cir. 1995); *Aeroquip Corp. v. Aetna Cas. and Sur. Co., Inc.*, 26 F.3d 893 (9th Cir. 1994); *American Mut. Liability Ins. Co. v. Beatrice Companies, Inc.*, 924 F. Supp. 861 (N.D. Ill. 1996); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278 (D. Utah 1994); *Hudson Ins. Co. v. Double D Management Co., Inc.*, 768 F. Supp. 1549 (M.D. Fla. 1991); *Cooper Dev. Co. v. Employers Ins. of Wausau*, 765 F. Supp. 1429 (N.D. Cal. 1991); *A. Johnson & Co. v. Aetna Cas. and Sur. Co.*, 741 F. Supp. 298 (D. Mass. 1990); *E.I. du Pont de Nemours v. Allstate Ins.*, 693 A.2d 1059 (Del. 1997); *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305 (Minn. 1995); *Northville Industries v. Nat. Union Ins.*, 89 N.Y.2d 621, 679 N.E.2d 1044, 657 N.Y.S.2d 564 (1997); *U.S. Industries v. Ins. Co. of N. Am.*, 110 Ohio App. 3d 361, 674 N.E.2d 414 (1996). But see *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1406 (D. Del. 1992).

■ The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Cerny v. Longley*, 270 Neb. 706, 708 N.W.2d 219 (2005). A movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to a judgment if the evidence were uncontroverted at trial. At that point, the burden of producing evidence shifts to the party opposing the motion. *Id.*

It is undisputed that the initial applicability of the pollution exclusion found in the USF&G and Empire policies has been

established. Thus, USF&G and Empire made their prima facie case for summary judgment on the basis of such exclusion. Dutton argues, however, that it presented a material issue of fact as to whether the exception to the pollution exclusion applies. In order to determine whether such a material issue of fact exists, we must first determine the meaning of the phrase. The sudden and accidental exception to the standard pollution exclusion clause has been the subject of copious litigation. See, generally, e.g., Annot., 89 A.L.R.5th 1 (2001). However, it presents an issue of first impression for our court.

Since the "sudden and accidental" exception to the pollution exclusion clause is expressed in the conjunctive, both requirements must be met for the exception to become operative. See *Technicon v. American Home*, 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989). We ultimately conclude that the discharges leading to the pollution in issue in this case were not "sudden." We, therefore, affirm summary judgment as to USF&G and Empire on that basis, and need not address the meaning of the term "accidental," or any other alternative basis for summary judgment presented to the district court.

Courts have disagreed as to whether "sudden" refers to something temporally abrupt from an objective standpoint, something unexpected from the subjective standpoint of the insured, or whether the term is ambiguous. In considering the meaning of the term "sudden," several courts have noted that recognized dictionaries differ as to its meaning. See, e.g., *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990); *Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991); *Claussen v. Aetna Cas. &c. Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989).

In Webster's Third New International Dictionary of the English Language, Unabridged 2284 (1993), the primary definition of the term "sudden" is "happening without previous notice or with very brief notice: coming or occurring unexpectedly: not foreseen or prepared for." Webster's also lists synonyms for "sudden" that include "prompt" and "immediate."

Similarly, Black's Law Dictionary 1432 (6th ed. 1990) defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen;

unprepared for." In contrast, however, the Random House Dictionary of the English Language 1900 (2d ed. 1987) defines "sudden" in temporal terms as "happening, coming, made, or done quickly."

Accordingly, numerous courts have determined that the term "sudden," as used in the sudden and accidental pollution exclusion exception, is ambiguous and should be interpreted in favor of the insured, as referring to something subjectively unexpected. See, e.g., *Pepper's Steel & Alloys v. U.S. Fidelity & Guar.*, 668 F. Supp. 1541 (S.D. Fla. 1987); *U.S. v. Conservation Chemical Co.*, 653 F. Supp. 152 (W.D. Mo. 1986); *Ala. Plating v. U.S. Fidelity and Guar.*, 690 So. 2d 331 (Ala. 1996); *Sauer v. Home Indem. Co.*, 841 P.2d 176 (Alaska 1992); *Hecla Min. Co. v. New Hampshire Ins. Co., supra; Claussen v. Aetna Cas. &c. Co., supra; American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996); *Morton Intern., Inc. v. General Acc. Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993); *Textron, Inc. v. Aetna Cas. and Sur. Co.*, 754 A.2d 742 (R.I. 2000); *Greenville County v. Insurance Reserve Fund*, 313 S.C. 546, 443 S.E.2d 552 (1994); *Key Tronic Corporation v. Aetna*, 124 Wash. 2d 618, 881 P.2d 201 (1994); *Joy Technologies v. Liberty Mut. Ins.*, 187 W. Va. 742, 421 S.E.2d 493 (1992); *Just v. Land Reclamation, Ltd., supra; Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724 (Wyo. 1988). See, also, *MAPCO Alaska Petroleum v. Central Nat. Ins. Co.*, 795 F. Supp. 941 (D. Alaska 1991).

However, other courts have decided that in its common, vernacular understanding, "sudden" is unambiguous and is to be understood as objectively, temporally abrupt. See, e.g., *Bell Lumber and Pole Co. v. U.S. Fire Ins. Co.*, 60 F.3d 437 (8th Cir. 1995); *Buell Industries v. Greater N.Y. Mut. Ins.*, 259 Conn. 527, 791 A.2d 489 (2002); *E.I. du Pont de Nemours v. Allstate Ins.*, 693 A.2d 1059 (Del. 1997); *Dimmitt Chevrolet v. Southeastern Fidelity*, 636 So. 2d 700 (Fla. 1993); *North Pacific Ins. Co. v. Mai*, 130 Idaho 251, 939 P.2d 570 (1997); *Board v. Farmland Mut. Ins.*, 568 N.W.2d 815 (Iowa 1997); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 659 A.2d 1295 (1995); *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.*, 407 Mass. 675, 555 N.E.2d 568 (1990); *Auto-Owners Ins v City of Clare*, 446 Mich. 1, 521 N.W.2d 480 (1994); *Board of Regents*

*v. Royal Ins. Co.*, 517 N.W.2d 888 (Minn. 1994); *Sokoloski v. American West Ins. Co.*, 294 Mont. 210, 980 P.2d 1043 (1999); *Northville Industries v. Nat. Union Ins.*, 89 N.Y.2d 621, 679 N.E.2d 1044, 657 N.Y.S.2d 564 (1997); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986); *Kerr-McGee Corp. v. Admiral Ins. Co.*, 905 P.2d 760 (Okla. 1995); *Sharon Steel v. Aetna Cas. and Sur.*, 931 P.2d 127 (Utah 1997); *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535 (Wyo. 1996).

The court in *Buell Industries v. Greater N.Y. Mut. Ins., supra,* for instance, explained that " '[t]he existence of more than one dictionary definition is not the sine qua non of ambiguity. If it were, few words would be unambiguous.' " *Id.* at 546, 791 A.2d at 501, quoting *New Castle County v. Hartford Acc. and Indem. Co.*, 933 F.2d 1162 (3d Cir. 1991). The court concluded that in the context of the "sudden and accidental" exception to the pollution exclusion, the term "sudden" was unambiguous and that under its plain meaning, only a temporally abrupt release of pollutants would be covered by the exclusion exception. The court found it was simply "untenable" to construe the term "sudden" as an event whose only requirement is that it be unexpected to the observer. 259 Conn. at 544, 791 A.2d at 500. It thus quoted the California Court of Appeal, stating, " 'We cannot reasonably call "sudden" a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process.' " *Id.*, quoting *Shell Oil v. Winterthur Swiss Ins.*, 12 Cal. App. 4th 715, 15 Cal. Rptr. 2d 815 (1993). Similarly, the court stated, " 'It seems incongruous . . . to think of a leakage or seepage that occurs over many years as happening suddenly.' " *Id.* at 544, 791 A.2d at 501, quoting *Board of Regents v. Royal Ins. Co., supra.*

We conclude that under the terms of the policy at issue, an event occurring over a period of time is not sudden. The language of an insurance policy should be considered in accordance with what a reasonable person in the position of the insured would have understood it to mean. See *Olson v. Le Mars Mut. Ins. Co.*, 269 Neb. 800, 696 N.W.2d 453 (2005). We conclude that a reasonable person in the position of the insured would understand the term "sudden," as found in the context of the

qualified pollution exclusion, to refer to the objectively temporally abrupt release of pollutants into the environment.

The district court was correct in concluding that the fact that the discharges occurred over a period of time precluded Dutton's recovery against USF&G and Empire. We therefore affirm the summary judgment in favor of USF&G and Empire on that basis. However, because the policies with Continental and Northern did not contain the qualified pollution exclusion clause, we must consider other grounds submitted to the district court for summary judgment with regard to Continental and Northern.

## 2. STATUTE OF LIMITATIONS

The parties agree that the applicable statute of limitations is contained in Neb. Rev. Stat. § 25-205 (Cum. Supp. 2004), which provides a 5-year statute of limitations on written contracts. The question presented is when that 5-year period began to run. The defendants argue, and the district court so held, that the statute of limitations began to run when the insurer denied any duty to defend.

If the facts in a case are undisputed, the issue as to when the statute of limitations begins to run is a question of law. See *Reinke Mfg. Co. v. Hayes*, 256 Neb. 442, 590 N.W.2d 380 (1999). When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Shipler v. General Motors Corp., ante* p. 194, 710 N.W.2d 807 (2006).

We first note that coverage under an insurance policy or contract is generally understood to consist of two separate and distinct obligations: (1) the duty to defend any suit filed against the insured party and (2) the duty to pay, on behalf of the insured, sums for which the insured shall become legally obligated to pay because of injury caused to a third party by acts of the insured. See *Chief Indus. v. Great Northern Ins. Co.*, 268 Neb. 450, 683 N.W.2d 374 (2004). The district court, however, in deciding the statute of limitations, treated these two obligations indistinguishably. Although ultimately our conclusions as to when the statute of limitations begins to run on a duty to defend makes the failure to distinguish the two duties inconsequential, we will properly address each duty separately. We turn first to the duty to indemnify.

### (a) Duty to Indemnify

It is the general rule that a cause of action cannot accrue before the insurer fails to perform the obligations agreed to in the contract. See *Snyder v. EMCASCO Ins. Co.*, 259 Neb. 621, 611 N.W.2d 409 (2000). Nebraska has long held that a claim for indemnity accrues at the time the indemnity claimant suffers loss or damage. See *City of Wood River v. Geer-Melkus Constr. Co.*, 233 Neb. 179, 444 N.W.2d 305 (1989). We have elaborated that this means that the cause of action accrues and the statute of limitations begins to run not at the time of the underlying act causing the damage, but when the would-be indemnitee pays the judgment arising from the underlying loss or damage. See, *id.*; *Lyhane v. Durtschi*, 144 Neb. 256, 13 N.W.2d 130 (1944); *Bankers Surety Co. v. Willow Springs Beverage Co.*, 104 Neb. 173, 176 N.W. 82 (1920); *Northern Assurance Co. v. Borgelt*, 67 Neb. 282, 93 N.W. 226 (1903). See, also, *Snyder v. EMCASCO Ins. Co., supra* (prior to time when contract is violated, there is no justiciable controversy, and it would be illogical to let statute of limitations for bringing action begin to run before action can be brought).

Here, the duty to indemnify under the contracts with the defendants is upon the insured becoming legally obligated to pay the damages. At the earliest, such legal obligation arose with the first consent judgment against Dutton on August 14, 1998. Dutton filed suit on September 4, 2002, within 5 years of such judgment. Therefore, we conclude that the statute of limitations does not bar Dutton's cause of action for breach of the insurers' duty to indemnify.

### (b) Duty to Defend

We next consider the duty to defend as it relates to the policies with Continental and Northern.

The issue of when the statute of limitations begins to run for breach of contract on a duty to defend is an issue of first impression for this court. The insurers focus on continuing duty cases in Nebraska, which deal almost exclusively with professional negligence. However, such cases, and other general principles upon which the insurers wish to rely, are inapposite to the case at hand. Numerous courts from other jurisdictions have recognized

that the issue of the statute of limitations in the context of an insurer's duty to defend is a distinct area of law.

Courts that have addressed the issue of the statute of limitations for a duty to defend under an insurance contract have almost uniformly held that

> in an action by an insured against an insurer for refusal to defend, the insured's cause of action under general statutes of limitations accrues when judgment is obtained against the insured, as opposed to the date the insurer refused to defend, the date the insurer denies coverage, or the insured's payment of a compromise settlement.

17 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 236:102 at 236-94 to 236-95 (2000). See, also, 46 C.J.S. *Insurance* § 1154 (1993) (insured may elect to wait until final judgment is entered before filing action against insurance company for its failure to defend); Annot., 96 A.L.R.3d 1193 (1979) (notwithstanding argument by insurers that their alleged breach of contract occurred and insured's cause of action therefore accrued, when insurer rejected tender of defense, courts have ordinarily determined accrual of such action to be concurrent with termination of underlying litigation which insurer refused to defend). But see *Whatley v. City of Dallas*, 758 S.W.2d 301 (Tex. App. 1988). Courts have given various reasons for this general rule that the statute of limitations on a duty to defend will not run until after resolution of the underlying judgment.

The court in *Vigilant v. Luppino*, 352 Md. 481, 723 A.2d 14 (1999), rejected the insurer's argument pursuant to general principles stating that limitations periods begin to run when the plaintiff should have known of the breach. The insured argued that the cause of action for breach of contract accrued and the statute of limitations period for breach of a duty to defend began to run when the insurer sent the insured its letter denying coverage. The court held that the insurer was correct in stating that the insured's cause of action had accrued when it denied coverage; nevertheless, the duty to defend, by its very nature, was a continuing one that extended throughout the course of the litigation against the insured. The court reasoned that "[a]n insured should be allowed to expect the insurer to step in and cure its breach so long as the underlying action is continuing." *Id.* at 492, 723 A.2d at 19. The

court noted that although the insured could have brought a declaratory judgment action earlier, explaining that such actions were not generally encouraged and, therefore, certainly the failure to bring one would not operate to prejudice the insured.

The court in *Moffat v. Metropolitan Casualty Insurance Co. of New York*, 238 F. Supp. 165 (M.D. Pa. 1964), reasoned that to hold that the statute of limitations on a duty to defend began to run from the time of a denial letter would have absurd results. The court stated:

> In this day of crowded court calendars and delays of years before trial, an insured could find that the statute had run long before he had incurred his trial and appellate expenses. . . . Also it would lead to the multiplicity of suits, long in disfavor in law. There would be a suit for costs and expenses and then, after judgment against the insured, a suit for indemnity. The latter cannot be started until there is a final judgment against the insured.

*Id.* at 175.

The court in *Lambert v. Commonwealth Land Title Ins.*, 53 Cal. 3d 1072, 811 P.2d 737, 282 Cal. Rptr. 445 (1991), likewise explained that the statute of limitations for an insurer's breach of the duty to defend commenced when final judgment was entered in the underlying litigation. To hold otherwise, and allow the expiration of the statute of limitations on a lawsuit to vindicate the duty to defend even before the duty itself was to expire, would have "untenable" and "grim" results. *Id.* at 1077, 811 P.2d at 739, 282 Cal. Rptr. at 447. The court elaborated that many times, the insured is simply a private homeowner for whom it would be inequitable and harsh to demand that he defend the underlying action at his own expense and at the same time prosecute at his expense a separate action against the insurer for failure to defend.

The court in *Bush v. Safeco Insurance*, 23 Wash. App. 327, 596 P.2d 1357 (1979), simply declared that while an insurer's duty to defend may be separate from a duty to pay the judgment, both duties arise out of a written insurance contract and that a cause of action for breach of either duty accrues for purposes of the statute of limitations when the final judgment is entered. See, also, *Continental Casualty Co. v. Florida Power & Light Co.*,

222 So. 2d 58 (Fla. App. 1969) (cause of action for breach of duty to defend accrued when third-party litigation ended rather than earlier date when insurer denied coverage).

▇ We adopt the clear majority view that a cause of action on an insurer's duty to defend does not run until the underlying action is resolved against the insured. Accordingly, we reverse the district court's determination that Dutton's claims were barred by the statute of limitations.

### 3. NOTIFICATION

We next address whether summary judgment was proper as to Continental and Northern on the basis of Dutton's alleged breach of its duty to notify. The district court's determination that Dutton was barred by "late notice" specified only Northern and USF&G. However, Continental argues late notice as an additional basis upon which this court should affirm the district court's ruling in its favor. The issue having been properly presented below, we consider it as to Continental as well.

Dutton's policies with Continental and Northern set forth that it was the insured's duty:

> (a) In the event of an **occurrence**, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the Company or any of its authorized agents as soon as practicable.

The policies further provided that "(b) If claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative."

▇ In order to escape liability or the duty to defend on account of an insured's unreasonable and unexcused delay in giving notice of claim, a liability insurer is required to show that it was prejudiced. *Herman Bros. v. Great West Cas. Co.*, 255 Neb. 88, 582 N.W.2d 328 (1998). Prejudice is established by examining whether the insurer received notice in time to meaningfully protect its interests. *Mefferd v. Sieler & Co.*, 267 Neb. 532, 676 N.W.2d 22 (2004).

■ In addition, the insurer's ability to insist upon its insured's duty to notify may be waived through its representations to the insured. In *Thomas Kilpatrick & Co. v. London Guarantee & Accident Co.*, 121 Neb. 354, 237 N.W. 162 (1931), we held that an insurance company whose policy provides that the insured shall forward to the company every summons and other process in suits as soon as served upon him waives such provision by an unconditional denial of liability. We explained that as the insurer has already denied liability, it is neither necessary nor proper to notify the insurer again. However, in *Thomas Kilpatrick & Co.*, we affirmed a jury determination that an "unconditional" denial liability was made by the insurer despite the fact that no formal letter of denial was issued. Instead, there was conflicting testimony as to oral representations of the parties and the undisputed fact that the insurer had denied liability in another suit related to the same incident, thus creating "a circumstance which, in connection with all the other evidence, would tend to establish a course of conduct consistent with the contention" of the insured that liability had been denied. *Id.* at 358, 237 N.W. at 164.

In the context of clauses requiring the filing of proof of loss, we have further explained:

> The general rule is that a denial by the insurer, or its authorized agent, of liability under its policy, or any act or artifice to mislead the insured, and cause him to omit to perform a duty he would otherwise have performed, will operate as a waiver of a provision requiring proof.

*Barrett v. Northwestern Mutual Life Ins. Co.*, 124 Neb. 864, 871, 248 N.W. 391, 394 (1933). Thus, we have held that there is sufficient denial by the insurer to effect a waiver where the denial is of "such a character, or made under such circumstances, as reasonably to induce the belief that the submission of proofs will be useless." *Id.*

■ Similarly, with regard to clauses precluding the insured from entering into settlement agreements without authorization of the insurer, we have explained that the insurer waives its right to defend not only through an "express or unequivocal" denial, but in any instance where "the facts and circumstances warrant the inference that liability was, and would be, denied." *Otteman v. Interstate Fire & Cas. Co., Inc.*, 172 Neb. 574, 580, 111

N.W.2d 97, 101 (1961). We explained that "[t]he insured may not be deprived of his rights by a narrow and technical construction of formal requisites, by which that right is to be made available. On the contrary, a liberal and reasonable construction should be given." *Id.* Thus, in *Otteman*, we found a denial of coverage where there was an unreasonable delay to take action after notice of the claim, with correspondence reserving a decision on liability and asking for an interview, which when eventually conducted, failed to indicate any urgency to defend the insured's claim. The insured had accordingly, through such delay and equivocation, waived any right to insist on the policy provision regarding defense or settlement.

Northern does not dispute that its correspondence with Dutton should reasonably be read as a denial of coverage. Instead, it argues that because such denials were made before any notice of Dutton's claims as to the Well No. 3 pollution subsite, the denials applied only to the Hastings subsites, and did not apply to any claim arising out of Well No. 3. Continental admits that its denial of coverage was "unequivocal." Brief for appellee Continental at 12. However, it asserts that because one of the listed reasons for denying coverage was the absence of a "suit," Dutton should have still been held to its duty to forward every demand, notice, summons, or other process received when the EPA filed suit against it leading to the first consent judgment.

For the reasons that follow, we conclude that the district court erred in granting summary judgment to Continental and Northern on the basis of Dutton's alleged breach of the notice provisions of the contracts.

### (a) Continental

We first address Continental's claim that Dutton breached its duties under the notice requirements of the contract. Continental does not allege any prejudice from any lack of notice prior to its 1992 denial of liability. The 1992 letter to Dutton clearly stated that it was disclaiming coverage. The letter stated that it was doing so because Continental had concluded that the EPA's claim failed to constitute a claim for "property damage" as defined by the policy. While the letter also referred to the lack of a "suit," as defined by the policy, the reason for there being no "suit" was explained as follows: "It is Continental's position

that an administrative order or action does not constitute a 'suit.'" Under such reasoning, Dutton could safely assume that the eventual filing against it by the EPA would not change Continental's position. Accordingly, we conclude that there is an issue of fact precluding summary judgment as to whether the 1992 letter constituted a denial of liability such that Dutton could reasonably believe that any further notification or forwarding of documents would be fruitless. Assuming the letter did reasonably induce Dutton to believe that further correspondence would be useless, Dutton's notification duties under the contract were waived and could not be used by Continental as a basis for nonperformance.

### (b) Northern

The question presented with regard to Northern is whether its denials of liability upon notice of the Hastings subsites operate so as to waive Dutton's notice obligations as to the later-developed Well No. 3 subsite. Again, in this regard, we consider whether in any instance "the facts and circumstances warrant the inference that liability was, and would be, denied." *Otteman v. Interstate Fire & Cas. Co., Inc.*, 172 Neb. 574, 580, 111 N.W.2d 97, 101 (1961).

Northern's letter to Dutton indicated that there was not yet any "suit" as defined by the policy, but that regardless, any future "suit" might be inconsistent with the definitions of "occurrence" and "property damage," as well as perhaps other provisions of the policy.

As already discussed, the addition of equivocal language to correspondence is not decisive, and Northern in fact admits that Dutton reasonably took its letter as a denial of coverage. As a result, Dutton could have reasonably believed that further efforts of notification under the policies would be useless. We conclude an issue of fact precluding summary judgment exists as to whether the correspondence between Northern and Dutton was properly interpreted by Dutton as indicating that any Well No. 3 claim would be similarly denied.

### 4. LACHES

Finally, we address that portion of the district court's ruling reasoning that laches supported summary judgment in favor of

Continental. Northern cross-appeals the district court's failure to include it in this finding, so we address this issue as to Northern as well.

We conclude that the district court erred in granting summary judgment because of laches. The defendants assert that Dutton's delay in bringing suit resulted in the loss of important witnesses and in consent judgments being entered into without their participation. Dutton responds that any prejudice experienced by Continental or Northern is due to its own failure to investigate. See *Allstate Ins. Co. v. Novak*, 210 Neb. 184, 313 N.W.2d 636 (1981). Dutton argues that the defendants denied coverage at their own risk and that it should not be compelled to file suit before required by law simply to protect the parties from such denials.

Laches does not result from the mere passage of time, but from the fact that during the lapse of time, circumstances changed such that to enforce the claim would work inequitably to the disadvantage or prejudice of another. *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994). The defense of laches is not favored in Nebraska. It will be sustained only if a litigant has been guilty of inexcusable neglect in enforcing a right to the prejudice of his adversary. *Id.*

The case of *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F. Supp. 362 (D.N.J. 1995), is instructive. Therein, the court, after determining that the statute of limitations on a duty to defend did not begin to run until the final EPA consent orders were entered against the insured, rejected the insurer's argument that laches barred the insured's claim. The insurer argued that it was prejudiced by the fact that it had long since closed its claim file and that the insured had failed to keep them informed of communications with the EPA. The court concluded that the insurer, by its letter denying a duty to defend, had "already articulated its position, and the case law does not support the proposition that there are additional burdens placed upon an insured in order to protect its rights against its insurer once coverage has been denied." *Id.* at 369.

We similarly conclude that under the undisputed facts presented, laches does not operate to bar Dutton's claims. Dutton was under no duty to file a declaratory judgment suit earlier against the defendants, but was entitled to wait and bring a single suit

once the damages were more fully known. It would be incongruent to recognize this right while precluding its exercise through the operation of laches. Moreover, we note that had the insurers wished to avoid the prejudice inherent to the time that has elapsed, they were on notice of the matter and could have investigated it.

### 5. DUTTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

We turn now to Dutton's assertion that the district court erred in failing to grant its cross-motion for partial summary judgment. As to USF&G and Empire, since summary judgment was properly entered in their favor, the district court did not err in failing to grant Dutton's motion for partial summary judgment as to them.

As to Continental and Northern, Dutton's motion for partial summary judgment asked the court to declare the insurers jointly and severally liable and is only "partial" in the sense that certain damages have yet to be determined. Considering the number and complexity of the issues yet to be fully presented to or passed upon by the district court or briefed to this court, which may affect the defendants' liability under the policies, we decline to reverse the district court's denial of Dutton's motion for partial summary judgment. We do, however, note that in accordance with this opinion, the district court's reasoning that Dutton's motion should be denied because of its failure to "timely advise and keep apprised the insurance companies" is in error.

## VI. CONCLUSION

In conclusion, we affirm the district court's grant of summary judgment in favor of USF&G and Empire and we affirm the district court's denial of Dutton's motion for partial summary judgment. In all other respects, the district court's order is reversed and the cause is remanded for further proceedings.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

CONNOLLY and STEPHAN, JJ., not participating.