SOPHIA FARR ET AL., APPELLANTS AND CROSS-APPELLEES,
V. DESIGNER PHOSPHATE AND PREMIX INTERNATIONAL, INC.,
APPELLEE, AND FARM BUREAU INSURANCE COMPANY
OF NEBRASKA, GARNISHEE-APPELLEE AND CROSS-APPELLANT.

570 N.W. 2d 320

Filed October 17, 1997.   No. S-95-166.

Alan V. Johnson, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, and Dale M. Shotkoski, of Shotkoski & Mellor, for appellants.

Gary J. Nedved, of Bruckner, O'Gara, Keating, Henry, Davis & Nedved, P.C., for appellee Farm Bureau Ins. Co.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and FLOWERS, D.J., and BOSLAUGH, J., Retired.

GERRARD, J.

## INTRODUCTION

The appellants, Sophia Farr and others who are all minority shareholders in the appellee Designer Phosphate and Premix International, Inc. (DPPI), sought to collect a stipulated judgment which had been entered against the judgment debtor, DPPI, in the U.S. District Court for the District of Nebraska

regarding DPPI's sale of unregistered stock certificates. In the instant case, the appellants instituted a garnishment proceeding in Merrick County District Court against Farm Bureau Insurance Company of Nebraska (Farm Bureau), the liability insurer of DPPI. Following a bench trial, the district court dismissed the appellants' garnishment proceeding, finding that the stipulated judgment did not impose liability on DPPI within the meaning of the Farm Bureau general liability policies in effect during the relevant time periods. The appellants filed this appeal, and Farm Bureau cross-appeals. Because we conclude that the conduct at issue did not constitute an "occurrence" that would create liability under the liability policies, we affirm the judgment of the district court.

## FACTUAL BACKGROUND

This action arises out of the appellants' investment loss in DPPI. DPPI was in the business of processing premix livestock feed supplements and was managed on a day-to-day basis by Tim Tobiason. The appellants are a group of minority shareholders in DPPI referred to as the "Kansas group." Tobiason and shareholders supportive of him composed the majority of DPPI's shareholders. DPPI was formed in January 1989 as a result of the consolidation of four separate companies referred to as the "Designer Companies." The appellants were all shareholders in the various Designer Companies. Upon consolidation, the appellants tendered their Designer Companies stock certificates in exchange for stock certificates in DPPI.

The appellants became dissatisfied with DPPI's performance and Tobiason's management. In August 1989, Lloyd Farr, then a member of the board of directors of DPPI, contacted Nebraska's Department of Banking and Finance to see if DPPI had complied with the requirements of the Securities Act of Nebraska. An investigation revealed that DPPI had failed to register its stock pursuant to the act. In June 1990, the department told Tobiason that DPPI needed to remedy its sale of unregistered stock with a rescission offer to existing shareholders. Tobiason refused, and he was eventually removed from the board of directors in September 1990. Tobiason's actions prompted the appellants to file a lawsuit in federal district court.

This suit asserted several theories of recovery, including violations of federal securities law, the Kansas Securities Act, and the Securities Act of Nebraska, as well as breach of fiduciary duty, common-law fraud, common-law negligence, and negligent misrepresentation.

In regard to the allegation of negligent misrepresentation, the appellants asserted that Tobiason negligently made misstatements of material facts or negligently failed to disclose material facts in connection with the sale of stock in DPPI and the Designer Companies, the consolidation of the Designer Companies into DPPI, the financial condition of DPPI, and the future prospects of DPPI. The alleged material misstatements of fact included (1) that interest in the phosphate process developed by DPPI would generate several million dollars per year in income from licensing fees and additional income from the sale of equipment to licensees to process phosphate; (2) that DPPI had licensed manufacturers in approximately 20 foreign countries as well as the United States and that " 'this appears to promise [DPPI] a potential of millions of dollars of income in the years ahead' "; (3) that DPPI had a new project to convert corn into soybean meal and that it " 'promises much greater income than anything else we have ever done' "; (4) that the phosphate plant could yield profits of $500,000 to $1.35 million per year and that there would be no increase in labor or management of sales costs, " 'as all expenses have been in place one year' "; (5) that the phosphate plant started commercial scale production on February 9, 1989, and would generate sales of $250,000 per month and increase profits by $40,000 per month within the next 1 to 2 weeks; (6) that Tobiason had superior management ability and knowledge beneficial to DPPI and its shareholders; and (7) that the consolidation of the Designer Companies into DPPI was done to comply with federal securities laws. In June 1993, the parties entered into a settlement agreement in which DPPI consented to entry of a judgment against it in the sum of $600,000, but only as to the appellants' negligent misrepresentation claim. All other claims were dismissed with prejudice as part of the settlement.

The appellants sought to collect their judgment in a garnishment proceeding against Farm Bureau, holder of three liability

insurance policies issued to its insured, DPPI. The first identified insurance policy, a special multiperil policy, in effect from March 22, 1987, through March 22, 1990, had a property damage liability clause that provided, in pertinent part: "The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of . . . **property damage** to which this insurance applies, caused by an **occurrence** . . . ." Occurrence is defined as "an accident . . . which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**." Property damage is defined, in part, as "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period."

The second policy, a business protector umbrella liability policy, in effect from June 1, 1988, through August 4, 1989, defined the operative terms "property damage" and "occurrence" in precisely the same way as they were defined in the special multiperil policy. A third policy, a commercial policy, in effect from February 22, 1989, through February 22, 1991, had a property damage coverage clause that provided essentially the same type of coverage as the special multiperil policy. In the commercial policy, the operative term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Property damage is defined, in pertinent part, as "[p]hysical injury to tangible property . . . or [l]oss of use of tangible property that is not physically injured."

The appellants filed an application for determination of garnishee liability, controverting Farm Bureau's answers by identifying the three aforementioned liability policies and claiming that these policies provide coverage for the $600,000 judgment obtained by the appellants against DPPI. Farm Bureau answered the appellants' garnishment interrogatories, denying indebtedness to DPPI or having any property of DPPI's in its possession.

Following a bench trial, the district court found in favor of Farm Bureau and dismissed the appellants' cause of action. Specifically, the district court concluded that the claimed negli-

gence preceded the February 22, 1989, effective date of the commercial policy and that the two remaining liability policies did not protect against this risk, since there was no "'occurrence'" within the meaning of the policies and the loss of the appellants' investment was not "'property damage'" within the meaning of the policies.

## ASSIGNMENTS OF ERROR

The appellants assert that the district court incorrectly concluded that DPPI's admitted negligent misrepresentations did not constitute an "occurrence" and that the loss suffered was not "property damage" within the meaning of Farm Bureau's liability insurance policies.

Farm Bureau cross-appeals, contending that the district court erred in failing to find that the settlement agreement was a result of bad faith and not binding on Farm Bureau.

## SCOPE OF REVIEW

Garnishment is a legal proceeding. To the extent factual issues are involved, the findings of a garnishment hearing judge have the effect of findings by a jury and, on appeal, will not be set aside unless clearly wrong. *Barry v. Tanner*, 250 Neb. 116, 547 N.W.2d 730 (1996); *Watts v. Watts*, 250 Neb. 38, 547 N.W.2d 466 (1996). However, to the extent issues of law are presented, an appellate court has an obligation to reach independent conclusions irrespective of the determinations made by the court below. See *Union Ins. Co. v. Land and Sky, Inc.*, ante p. 184, 568 N.W.2d 908 (1997).

## ANALYSIS

The appellants contend that Tobiason's negligent misrepresentations caused them to exchange their Designer Companies stock for DPPI stock and that Tobiason's negligent act of failing to register the DPPI stock in accordance with the Securities Act of Nebraska caused them to suffer property damage in the form of the loss of use of their stock certificates. The appellants further assert that the measure of damages for Tobiason's negligent act is the diminution in value of their stock. This amount, argue the appellants, is equal to the amount that the appellants would have recovered had Tobiason rescinded the sale of the unregis-

tered stock certificates as ordered by Nebraska's Department of Banking and Finance.

Farm Bureau defends by claiming that the appellants are unable to allege facts which would constitute an "occurrence" within the meaning of its insurance policies with DPPI. The district court agreed with Farm Bureau and found that the stipulated judgment does not assert an "occurrence" within the meaning of the Farm Bureau liability insurance policies.

Thus, the issue presented requires us to first determine what types of events are accidents and thus "occurrences" within the meaning of the Farm Bureau policies, and then, if necessary, determine whether an event or events in the causal chain triggered Farm Bureau's duty to indemnify in this case.

The Farm Bureau liability policies at issue define an occurrence in essentially the same manner, that being, as an accident which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. This definition of occurrence requires a two-part analysis. First, the occurrence must be an accident, and second, the property damage resulting from the accident must be neither expected nor intended from the standpoint of the insured. See *Farmers Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291 (10th Cir. 1996).

### Occurrence Must Be Accidental

We must initially determine whether the events complained of are accidental within the meaning of the subject liability policies. We have said that an accident within the meaning of liability insurance contracts includes any event which takes place without the foresight or expectation of the person acted upon or affected thereby. *Sullivan v. Great Plains Ins. Co.*, 210 Neb. 846, 317 N.W.2d 375 (1982); *Riley v. National Auto Ins. Co.*, 162 Neb. 658, 77 N.W.2d 241 (1956).

We have also stated, in the context of damage to personal property, that where acts are voluntary and intentional and the injury is the natural result of the act, the result was not caused by accident even though that result may have been unexpected, unforeseen, and unintended. See, *Millard Warehouse, Inc. v. Hartford Fire Ins. Co.*, 204 Neb. 518, 283 N.W.2d 56 (1979); *Foxley & Co. v. United States Fidelity & Guaranty Co.*, 203

Neb. 165, 277 N.W.2d 686 (1979). In other words, a volitional act does not become an accident simply because the insured's negligence prompted the act. *Red Ball Leasing v. Hartford Acc. & Indem. Co.*, 915 F.2d 306 (7th Cir. 1990). Injury that is caused directly by negligence must be distinguished from injury that is caused by a deliberate and contemplated act initiated at least in part by the actor's negligence at some earlier point. The former injury may be an accident. However, the latter injury, because it is intended and the negligence is attenuated from the volitional act, is not an accident. *Id.*

The appellants point to three possible "occurrences" in the instant case: the failure to register the stock, the sale of the unregistered stock, and the failure to offer rescission to the affected shareholders. However, the time of the occurrence of an accident, within the meaning of a liability indemnity policy, is not the time when the wrongful act was committed, but the time when the complaining party was actually damaged. *Friendship Homes v. American States Ins.*, 450 N.W.2d 778 (N.D. 1990); *Millers Mut. Fire Ins., Etc. v. Ed Bailey*, 103 Idaho 377,.647 P.2d 1249 (1982) (it is well settled that time of occurrence of accident, within meaning of liability indemnity policy, is time complaining party was damaged rather than time wrongful act was committed; this rule followed in every jurisdiction that has considered issue except Louisiana); *Moss v Shelby Mutual*, 105 Mich. App. 671, 308 N.W.2d 428 (1981) (time when complainant is damaged, rather than time of negligent act, is point at which responsibility accrues under indemnity policy); *Singsaas v. Diederich*, 307 Minn. 153, 238 N.W.2d 878 (1976) (generally accepted rule is that time of occurrence is not time wrongful act was committed but time complaining party was actually damaged). See, also, 11 George J. Couch, Cyclopedia of Insurance Law § 44:8 (rev. 2d ed. 1982); 1 Rowland H. Long, The Law of Liability Insurance § 1.08[1] (1997).

The appellants argue that the point in time when they were actually damaged was either when they received their unregistered stock certificates or when Tobiason refused to rescind the sale of the stock certificates. We need not choose one event over the other, as both events allege an injury caused by a deliberate

and contemplated act from the standpoint of the insured, that being, the sale of, or the failure to rescind the sale of, the stock certificates. Further, both events were initiated, at least in part, by Tobiason's negligence at some earlier point, that being, Tobiason's failure to properly register the DPPI stock in early 1989. Thus, we conclude that the events complained of are not accidents, because they were intended, deliberate acts initiated by Tobiason's negligence, which was well attenuated from the volitional act itself.

### PROPERTY DAMAGE MUST NOT BE INTENDED

Notwithstanding the obvious volitional quality of the act of exchanging the stock certificates, the appellants argue that the exchange of the stock certificates was not a voluntary or intentional act, but, instead, constituted negligent misrepresentation on the part of Tobiason. In support of their argument, the appellants direct us to *First Newton Nat. Bank v. Gen. Cas. Co.*, 426 N.W.2d 618 (Iowa 1988). In *First Newton Nat. Bank v. Gen. Cas. Co.*, the Iowa Supreme Court held that a petition alleging negligent misrepresentation gave rise to a duty to defend on the part of the insurer because negligent conduct rather than intentional conduct on the part of its insured would constitute an occurrence within the meaning of the insurance policy.

The appellants' reliance on *First Newton Nat. Bank v. Gen. Cas. Co.* is misplaced. First, the issue in *First Newton Nat. Bank v. Gen. Cas. Co.* concerns an insurer's duty to defend. The issue in the instant case concerns the insurer's duty to indemnify. An insurer's duty to defend is broader than its duty to indemnify. *John Markel Ford v. Auto-Owners Ins. Co.*, 249 Neb. 286, 543 N.W.2d 173 (1996).

Further, we are not persuaded by the reasoning set forth in *First Newton Nat. Bank v. Gen. Cas. Co., supra.* The Iowa court relies on the elements of negligent misrepresentation as found in the Restatement (Second) of Torts § 552 (1977), but yet, opines that the very definition of negligent misrepresentation connotes negligent rather than intentional conduct. See *First Newton Nat. Bank v. Gen. Cas. Co., supra.*

This view is inconsistent with our decision in *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994),

wherein we concluded that § 552 of the Restatement, *supra*, required that one supplying the misrepresentation must *intend* to supply the information and that such person must *intend* that the information will induce reliance and influence the transaction.

Thus, because negligent misrepresentation requires an intent to induce reliance, it is more appropriately viewed as a sub-species of fraud. See, *Dykstra v. Foremost Ins. Co.*, 14 Cal. App. 4th 361, 17 Cal. Rptr. 2d 543 (1993); *Chatton v. National Union Fire Ins. Co.*, 10 Cal. App. 4th 846, 13 Cal. Rptr. 2d 318 (1992). Insurance coverage designed to protect against contingent or unknown risks of harm should not be triggered by an event wherein there was an intent to induce reliance.

Because Tobiason's actions were neither an accident nor unintended from the standpoint of the insured, we determine that the acts of Tobiason, DPPI's agent, did not constitute an "occurrence" within the meaning of the Farm Bureau liability policies. As a result of our determination, we do not address the merits of Farm Bureau's cross-appeal.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.