778 N.W.2d 433 (2010)
279 Neb. 365
DUTTON-LAINSON COMPANY, a Nebraska corporation, appellant and cross-appellee,
v.
The CONTINENTAL INSURANCE COMPANY, a corporation, and Northern Insurance Company of New York, a corporation, appellees and cross-appellants.
No. S-09-164.
Supreme Court of Nebraska.
February 5, 2010.
*437 James W.R. Brown, Steven J. Olson, and Thomas R. Brown, of Brown & Brown, P.C., L.L.O., Omaha, for appellant.
Peter B. Kupelian and Carol G. Schley, of Kupelian, Ormond & Magy, P.C., Southfield, MI, and Thomas J. Culhane, of Erickson & Sederstrom, P.C., Omaha, for appellee Northern Insurance Company of New York.
Robert S. Keith, of Engles, Ketcham, Olson & Keith, P.C., Omaha, and Eileen King Bower and David Cutter, of Troutman Sanders, L.L.P., Chicago, IL, for appellee The Continental Insurance Company.
HEAVICAN, C.J., WRIGHT, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

INTRODUCTION
In the 1940's, Dutton-Lainson Company (Dutton) began a manufacturing business in Hastings, Nebraska. Dutton used various solvents in its operations to clean machines and parts. Beginning in 1985, the Environmental Protection Agency (EPA) required Dutton to remediate environmental contamination on its premises and other *438 sites. Dutton filed claims with its insurers, which denied coverage.
Dutton sued The Continental Insurance Company (Continental) and Northern Insurance Company of New York (Northern), seeking indemnification for expenses related to the EPA investigation and the resulting cleanup. The Douglas County District Court found that Dutton had sustained total damages of $3,801,521.70. The court applied a pro rata, time-on-the-risk allocation of damages and entered judgment for Dutton against Continental in the amount of $475,190.21 and against Northern in the amount of $74,937.89. Dutton has appealed, and Continental and Northern have cross-appealed. We affirm.

SCOPE OF REVIEW
A suit for damages arising from breach of a contract presents an action at law. Albert v. Heritage Admin. Servs., 277 Neb. 404, 763 N.W.2d 373 (2009).
The interpretation of an insurance policy is a question of law. In reviewing questions of law, an appellate court resolves the question independently of the lower court's conclusion. Rickerl v. Farmers Ins. Exch., 277 Neb. 446, 763 N.W.2d 86 (2009).

FACTS

POLLUTION AND EPA
Dutton's manufacturing business used various solvents to clean machines and parts. From approximately 1948 to 1971, the cleaning solvents contained trichloroethylene (TCE), and from approximately 1971 to 1985, the solvents contained "1,1,1, trichloroethane" (TCA).
Between February 1962 and October 1964, Dutton placed the solvents and sludge-filled degreaser fluid in sealed metal drums that were deposited in a city-operated landfill referred to as the "North Landfill." From October 1964 to July 1982, Dutton placed sludge from the degreaser and, prior to September 7, 1977, sludge-filled solvent fluid in sealed metal containers and deposited them in the city-operated "South Landfill."
After the drums and containers were deposited in the landfills, they were either emptied by Dutton employees or bulldozed by the landfill operator and crushed, causing the sludge and solvent to be released and allowing TCE and TCA to seep into the soil and ground water at both sites. Dutton's deposits in the North and South Landfills were in compliance with then-existing laws and ordinances for the disposition of these solvents, and Dutton did not anticipate that the solvents would cause pollution of the soil or ground water.
In the early 1980's, testing at a number of municipal wells in Hastings revealed the presence of TCE. The EPA began an investigation and, on September 23, 1985, notified Dutton that it was a potentially responsible party (PRP) for the cost of cleaning up the contamination at the North and South Landfills and the contamination that emanated from those sites.
In addition, between 1948 and 1987, Dutton's regular manufacturing operations caused solvents containing TCE and TCA to spill onto the concrete floor of its operating premises and seep into the ground water beneath. The contaminants spread via the ground water to adjacent property. The pollution emanating from such seepage was designated as "Well No. 3."
Until Dutton received a letter from the EPA dated November 5, 1992, Dutton was unaware that the solvent was migrating through the concrete floor and invading the soil and ground water. The letter informed Dutton that it was a PRP for the cost of cleaning up the contamination at *439 the Well No. 3 subsite and the contamination that had emanated from that subsite.
On December 28, 2001, the EPA notified Dutton that it was a PRP for "Operable Unit 19," which was an area-wide ground water contamination subsite allegedly contaminated by leaching from the other subsites that had not been addressed by other response actions. The polluted areas were eventually designated as a single EPA "Superfund site," made up of seven distinct subsites.
The PRP notices generally gave Dutton a specified period of time to voluntarily undertake cleanup of the various subsites. The notices stated that if no cleanup action was taken, the EPA would design and implement its own plan and would collect reimbursement from Dutton if it were ultimately determined to be a PRP.
Beginning August 14, 1998, consent decrees were entered in the U.S. District Court for the District of Nebraska between Dutton and the EPA regarding cleanup of the various subsites. Pursuant to these decrees, Dutton has conducted extensive cleanup and continues to address the contamination. The cleanup is expected to continue until 2017.

INSURANCE HISTORY
Throughout its manufacturing operations, Dutton carried insurance policies with many different insurers, including United States Fidelity and Guaranty Company (USF & G), Empire Fire and Marine Insurance Company (Empire), Continental, and Northern. Continental issued three primary general liability policies: policy No. CBP415666 (apparently effective August 1, 1980, to August 1, 1983), policy No. CBP914504 (apparently effective August 1, 1981, to August 1, 1984), and policy No. CBP900212 (effective October 1, 1984, to October 1, 1987). Northern issued a general liability policy, No. SM57686390, for the period August 1 to October 1, 1983, and a second policy, No. SM37686395, for the period October 1, 1983, to October 1, 1986. This policy was canceled by Dutton effective October 1, 1984.
In November 1985, Dutton notified Continental and Northern of the EPA's designation of Dutton as a PRP for the North and South Landfills. Northern responded that it did not believe any "suit" within the meaning of the policy had yet been brought. Therefore, Northern asserted that it was premature to determine whether there was coverage and that the policy definitions of "occurrence" and "property damage," as well as other provisions, might limit coverage. Northern asked to be kept apprised of the EPA's investigation.
In February 1987, Continental sent Dutton a strict reservation of rights, asserting that there was a good likelihood that no coverage existed or that coverage was excluded by Continental's policies. Dutton updated its notice to Continental in 1991. In February 1992, Continental sent a letter to Dutton denying coverage for the claims.
On September 4, 2002, Dutton sued USF & G, Empire, Continental, and Northern, seeking indemnification for sums expended to defend against the EPA's investigation and to conduct the environmental cleanup, including future expenditures. We affirmed the summary judgment entered in favor of USF & G and Empire, whose policies contained qualified pollution exclusions. See Dutton-Lainson Co. v. Continental Ins. Co., 271 Neb. 810, 716 N.W.2d 87 (2006) (Dutton I). We concluded that Dutton could not recover from USF & G and Empire. However, there were issues of fact precluding summary judgment as to Continental and Northern. Thus, we reversed *440 the judgment and remanded the cause for further proceedings as to the policies issued by Continental and Northern, which are the subject of this appeal.
Dutton sought judgment against Continental and Northern, jointly and severally, in the sum of $4,854,231.49 plus interest and attorney fees. After a trial, the court entered judgment in favor of Dutton and against Continental and Northern.
In allocating the damages, the trial court applied a pro rata, time-on-the-risk method. It divided Dutton's damages evenly over the 40-year period from 1948 to 1987 during which contaminants were deposited. The court found that the Continental policies were in effect for 60 months and that Continental provided coverage for all four sites. Continental's share of the time-on-the-risk was calculated by dividing 60 months by 480 months, the total number of months the contaminants were deposited. The court calculated Continental's share as 12.5 percent of the total damages, for damages of $475,190.21.
The trial court concluded that Northern was liable for only the North and South Landfills. It denied coverage for Well No. 3 and Operable Unit 19 because of the late notice provided by Dutton. It found that Northern provided coverage for 14 months and that its share of the relevant damages was 2.91666 percent. The court awarded $74,937.89 in damages against Northern.

ASSIGNMENTS OF ERROR
Dutton assigns 18 errors which, summarized and restated, allege that the trial court erred in (1) finding that Northern had not waived notice with respect to Well No. 3 and Operable Unit 19 and that Northern was prejudiced by the alleged lack of notice, (2) finding that there was only one "occurrence" as defined in the policies, (3) finding that Dutton was not entitled to recover employee costs of $1,031,836.99, (4) refusing to allow Dutton prejudgment interest, (5) not holding Continental and Northern jointly and severally liable, (6) not entering declaratory judgment that Continental and Northern were liable for indemnity and defense costs for future remediation, and (7) not allowing attorney fees.
Continental cross-appealed, claiming that the trial court erred in (1) finding that a PRP letter was a "suit" triggering a duty to defend under Continental's policies, (2) finding Dutton gave proper notice to Continental, and (3) its calculation of damages by (a) not requiring Dutton to prove that property damage occurred within the Continental policy periods; (b) adopting Dutton's categorization of damages; and (c) failing to allocate damages through 2017, when the remediation is expected to be complete.
Northern cross-appealed, claiming that the trial court erred in (1) finding that there was one occurrence and (2) determining damages recoverable from Northern.

ANALYSIS

NOTICE TO NORTHERN
Dutton argues that the trial court erred in its findings concerning notice given to Northern and in finding that Northern was prejudiced by the alleged lack of notice.
The record shows that Dutton first sent Northern a letter on November 1, 1985, informing the insurer that Dutton had been notified it was a PRP for contamination of the North and South Landfills. Dutton stated that it would provide additional information as to any developments concerning Dutton's liability.
The policies set forth the insured's duty as follows:

*441 (a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the Company or any of its authorized agents as soon as practicable.
The policies further provided that "[i]f claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative."
Northern responded by letter of April 16, 1986, that no "suit" within the meaning of the policy had been brought. Thus, any determination as to coverage would be premature. Northern stated that coverage for payments sought by future litigation might be inconsistent with the definitions of "occurrence" and "property damage" in the policies. Northern stated: "We would appreciate, however, being kept apprised of the progress of EPA's investigation, and would welcome any future information that you believe relevant."
On August 12, 1986, Northern again wrote to Dutton, stating: "We . . . request that you kindly contact the undersigned as soon as possible in writing regarding the above [ground water contamination] matter. We would appreciate any status that you may have regarding same, and any new developments which may have taken place, which we are not aware of." Northern had no further contact until the lawsuit was filed by Dutton in September 2002.
In Dutton I, we stated that notice to Northern for the Well No. 3 subsite would be excused if Dutton could reasonably have believed that further efforts at notification under the policy would be useless. The trial court in the current case found that Dutton did not provide convincing evidence that it believed further notice would be useless. Dutton admitted that any such notice was provided long after significant remediation efforts had taken place and that, in fact, no notice was provided until the lawsuit was filed in 2002, even though Dutton learned it was a PRP for Well No. 3 in 1992 and commenced remediation efforts for Operable Unit 19 in 1998.
Even if the notice given to Northern was not timely, the insurer was also required to prove that it was prejudiced by the late notice. "Prejudice is established by examining whether the insurer received notice in time to meaningfully protect its interests." Dutton I, 271 Neb. at 828, 716 N.W.2d at 102. The trial court concluded that Northern had shown actual prejudice. The record showed that Dutton voluntarily entered into agreements acknowledging its responsibility for the contamination, spent significant sums to remediate, and performed the remediation without giving Northern an opportunity to participate in discussions or formulate a course of action. Thus, Dutton had determined its obligations with the EPA before Northern was even aware of the claims.
We agree with the trial court. Dutton determined its obligation with the EPA before Northern was aware of the claims, and there was no evidence that Dutton reasonably believed that further notification to Northern would be useless. The court found the failure to provide notice was an oversight of routine corporate procedure. Based upon the record, the court found that Dutton gave no consideration to providing notice to Northern and that Dutton could not have reasonably believed such notice would be useless. A trial court's findings of fact will be upheld on appeal unless clearly wrong. See Albert *442 v. Heritage Admin. Servs., 277 Neb. 404, 763 N.W.2d 373 (2009).
We conclude the trial court did not err in finding that Dutton's failure to notify Northern was prejudicial. Dutton presented no evidence to justify its late notice to Northern. Northern requested an update from Dutton in 1986, and Dutton did not respond. The court correctly determined that Northern was not required to provide coverage for Well No. 3 and Operable Unit 19 and that Dutton should not recover from Northern any damages allegedly incurred in connection with those two subsites.

NUMBER OF OCCURRENCES
Dutton argues that the trial court erred in finding that three separate events constituted one occurrence. It argues that the deposit of waste at the North and South Landfills and the dripping of solvent onto the factory floor were separate occurrences. The Northern policies limited property damage liability to $100,000 per "occurrence," and the Continental policies had an "occurrence" limit of $1 million.
The policies provided: "The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to `each occurrence.'"
We initially point out that if the trial court correctly apportioned the damages according to the number of months that each policy provided coverage, the number of occurrences would not change the award to Dutton. Northern's limits were $100,000 per occurrence, and Continental's limits were $1 million per occurrence. Neither award ordered by the court exceeded the limits of the policies for one occurrence.
Dutton asserts that there was more than one occurrence. It is, however, impossible for Dutton to prove what damages were sustained during the relative periods of coverage by each insurer. The trial court's application of a time-on-the-risk allocation is a reasonable apportionment of the damages based upon one continuing occurrence. Should each event be a separate occurrence, then the burden would be upon Dutton to establish the damages that resulted during the periods the insurance policies were in effect. There was no evidence to separate the amounts of damage that resulted from each alleged occurrence.
The trial court found that Dutton deposited contaminants in the North Landfill from February 1962 through October 1964, the South Landfill from October 1964 through September 1982, and Well No. 3 from 1948 to 1987. Dutton offered testimony from Dr. Roy Spalding, a hydrologist who assisted Dutton in complying with the EPA directives at each of the subsites.
Spalding testified that the TCE and TCA were the source of Dutton's contribution to the contamination at the subsites and that the contamination of ground water will continue until remediation has been completed. Remediation is expected to be completed at Well No. 3 in 2012 and at the North Landfill by 2017. At trial, it was unknown when the remediation of the South Landfill and Operable Unit 19 would be complete. Spalding testified that it was impossible to determine the actual amount of contamination that took place during any given time period or to allocate expenses Dutton incurred to any specific period.
The trial court stated that in order to find there had been three occurrences and require coverage for the costs of remediation, Dutton's actions that caused the damage would have had to occur during the *443 policy periods. The court noted that if there were three occurrences, Continental and Northern could not be responsible for contamination of the North Landfill, because the contamination occurred between 1962 and 1964, which was prior to the policy periods. The same would be true of responsibility for contamination of the South Landfill, which occurred between 1964 and 1982, because Northern's policy began in 1983. The court determined that the contamination of all subsites occurred as a result of the continuous actions of Dutton and not as the result of three separate occurrences. We agree.
The trial court relied on Sunoco, Inc. v. Illinois Nat. Ins. Co., 226 Fed.Appx. 104 (3d Cir.2007), in which the court was asked to determine whether the insurance company had a duty to defend when 77 lawsuits were filed against Sunoco, Inc. The contamination caused by Sunoco's product occurred in different geographical regions and resulted in 77 claims from a variety of sources that included gas tank leaks and accidental spills. The federal court found that the injuries were caused by one occurrence  the hazardous manufacture of gasoline containing the contaminant and failure to warn.
The federal court noted that its inquiry was "whether there [was] `one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage.'" Id. at 107. The court referred to this as the "`cause test,'" which requires that "`[a]s long as the injuries stem from one proximate cause there is a single occurrence.'" Id., quoting Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3d Cir.1982).
The U.S. Court of Appeals for the Third Circuit has noted that a majority of jurisdictions have adopted the cause test. See Liberty Mut. Ins. Co. v. Treesdale, Inc., 418 F.3d 330 (3d Cir.2005). In that case, the court held that the sale and manufacture of asbestos products by the insured over several years constituted one occurrence. Another federal court held that a gas company's use of a product in its insulation program was a single occurrence because "the number of occurrences turns on the underlying cause of the property damage." Colonial Gas Co. v. Aetna Cas. & Sur. Co., 823 F.Supp. 975, 983 (D.Mass. 1993).
In the case at bar, the trial court concluded that there was one occurrence, which began with Dutton's actions in 1948 and continued until 1987. An "occurrence" is defined in Northern's policies as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The court determined that Dutton deposited the waste in compliance with then-existing laws and did so intentionally, even though it did not expect or intend to pollute the ground water. The court found no ambiguity in the policies' definition of the term "occurrence."
Contamination occurred at four different sites, but all of the contamination was caused by the actions of Dutton. The underlying cause of the damage was the use of TCE and TCA in the manufacturing operation. This action was continuous and repeated over a number of years. We conclude that the trial court correctly determined that there was one occurrence.

EMPLOYEE COSTS
Dutton also claims that the trial court erred in not allowing Dutton to recover employee costs of $1,031,836.99 for time spent on the investigation and remediation of contamination. The court determined that Dutton did not provide sufficient evidence of its employee costs and that the evidence provided was obtained *444 by guess and conjecture. Dutton provided only a general estimate of employee costs based on the percentage of time certain employees worked on the EPA matter.
While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008). Dutton claims it should recover portions of its employees' time spent responding to the EPA requests and working on the pollution remediation. As to the sufficiency of the evidence, we review the trial court's findings of fact for clear error. See Albert v. Heritage Admin. Servs., 277 Neb. 404, 763 N.W.2d 373 (2009). We conclude the court was not clearly wrong in denying the employee costs.
Dutton offered an exhibit prepared by Dutton's vice president and chief financial officer. He interviewed employees about the amount of time they recalled spending on EPA issues, but he was not able to obtain specific information for each year. He then retrieved salary information for the employees and multiplied salaries by the time they reported spending on EPA matters. One of the employees had died in 1998, and other employees had left employment with Dutton by the time the information was gathered. There were no timesheets or other hourly reports on which to rely. The evidence of employee costs was, as the trial court found, based on speculation and conjecture, and the court did not err in refusing to award employee costs to Dutton.

PREJUDGMENT INTEREST
Dutton assigns error in the trial court's refusal to award prejudgment interest. The trial court declined to award such interest because the damages were in dispute and were never certain.
Whether prejudgment interest should be awarded is reviewed de novo on appeal. Archbold v. Reifenrath, 274 Neb. 894, 744 N.W.2d 701 (2008). Prejudgment interest may be awarded only as provided in Neb.Rev.Stat. § 45-103.02(2) (Reissue 2004). Archbold v. Reifenrath, supra. Under § 45-103.02(2), prejudgment interest is recoverable only when the claim is liquidated, that is, when there is no reasonable controversy as to the plaintiff's right to recover and the amount of such recovery. This determination requires a two-pronged inquiry. There must be no dispute as to the amount due and to the plaintiff's right to recover. Archbold v. Reifenrath, supra.
There was obviously a dispute as to whether Dutton was entitled to recover any damages and, if so, the amount. The trial court did not err in refusing to award prejudgment interest.

JOINT AND SEVERAL LIABILITY
Dutton next claims error in not holding Continental and Northern jointly and severally liable. Dutton seems to be arguing that the trial court erred in applying a pro rata, time-on-the-risk allocation of the damages instead of requiring each insurer to pay the total amount of the alleged damages. Dutton provides little case law to support this claim.
Continental and Northern both urge this court to find that the trial court was correct in rejecting joint and several liability in favor of a pro rata, time-on-the-risk allocation. That method
assumes that the damages in a contamination case are evenly distributed (or continuous) through each policy period from the first point at which damages occurred to the time of discovery, cleanup or whenever the last triggered policy period ended. Each triggered policy *445 therefore bears a share of the total damages proportionate to the number of years it was on the risk relative to the total number of years of coverage triggered.. . . While such an allocation scheme is attractive for its simplicity, we recognize that damages are by nature fact-dependent and that trial courts must be given the flexibility to apportion them in a manner befitting each case.
NSP v. Fidelity & Cas. Co. of New York, 523 N.W.2d 657, 663 (Minn.1994).
The Minnesota Supreme Court has stated that "contamination of the groundwater should be regarded as a continuous process in which the property damage is evenly distributed over the period of time from the first contamination to the end of the last triggered policy (or self-insured) period." Id. at 664.
[T]he total amount of the property damage should be allocated to the various policies in proportion to the period of time each was on the risk. If, for example, contamination occurred over a period of 10 years, 1/10th of the damage would be allocable to the period of time that a policy in force for 1 year was on the risk and 3/10ths of the damage would be allocable to the period of time a 3-year policy was in force. The amount so determined does not, however, necessarily represent the amount of the insurer's liability with respect to that policy.
Id.
We conclude that Dutton cannot assert joint and several liability without proving the amount of damages that resulted during the periods of coverage provided by each insurer. There were numerous insurers, and each policy represented a different time during the events from 1948 to 1987. If a time-on-the-risk allocation is not applied, then damages for each period of policy coverage must be established by Dutton.
Dutton's argument for joint and several liability would equate liability for the entire occurrence even though the coverage under each policy was for a limited time. This does not appear to be a reasonable assertion.
In Consolidated Edison Co. of N.Y. v. Allstate, 98 N.Y.2d 208, 774 N.E.2d 687, 746 N.Y.S.2d 622 (2002), the court, in rejecting the argument that insurers were jointly and severally liable, concluded that joint and several allocation was not consistent with policy language providing indemnification for all sums of liability that resulted from an accident or occurrence during the policy period. Since there was one occurrence, the damage allocated to each policy providing coverage was based upon the amount of time that the policy was in force during such occurrence. Other courts have found this to be a fair manner in which to allocate coverage for the occurrence. We agree.
Under the policies, the insurance companies were to provide coverage for property damage that occurred during the policy period. A pro rata, time-on-the-risk allocation satisfies the language of the policies, and the trial court did not err in using this method.

DECLARATORY JUDGMENT
Dutton argues that the trial court erred in failing to enter a declaratory judgment finding that Continental and Northern were liable for indemnity and defense costs incurred for future remediation. Dutton wants Continental and Northern to be held "liable for all amounts required to be expended" by Dutton with respect to the North and South Landfills, Well No. 3, and Operable Unit 19.
Continental argues that Dutton is actually seeking an award of future damages *446 and that Dutton failed to prove such damages. During trial, Continental's objections to Dutton's evidence about the possibility of future damages were sustained and the court refused to allow testimony about future costs.
The trial court made no ruling on future damages and did not reserve for further determination the question of declaratory relief. "As a general matter, where an order is clearly intended to serve as a final adjudication of the rights and liabilities of the parties, the silence of the order on requests for relief not spoken to can be construed as a denial of those requests under the circumstances." D'Quaix v. Chadron State College, 272 Neb. 859, 863, 725 N.W.2d 558, 561 (2007). The court's silence on the subject of declaratory relief, along with its sustaining of objections to the introduction of testimony concerning future damages, serves as a denial of Dutton's request for declaratory judgment. The trial court did not err in failing to grant declaratory relief, because Dutton failed to prove future expenses.

ATTORNEY FEES
Finally, Dutton claims the trial court erred in failing to grant attorney fees. The court's order was silent on the issue of attorney fees.
Neb.Rev.Stat. § 44-359 (Reissue 2004) provides that in an "action upon any type of insurance policy . . . against any company,. . . the court, upon rendering judgment against such company, . . . shall allow the plaintiff a reasonable sum as an attorney's fee." However, "if the plaintiff fails to obtain judgment for more than may have been offered by such company, . . . in accordance with section 25-901, then the plaintiff shall not recover the attorney's fee provided by this section." § 44-359.
Continental made an offer to confess judgment for $748,828.88 before trial. Dutton refused the offer, and judgment was entered against Continental for $475,190.21. Northern made an offer to confess judgment before trial in the amount of $445,000. Dutton refused, and judgment was entered against Northern for $74,937.89. The pretrial offers were for more than the amount of the final judgment awarded by the court.
We have stated that § 44-359 read in conjunction with Neb.Rev.Stat. § 25-901 (Reissue 2008) "prohibit[s] an award of attorney fees to a plaintiff, in a suit against the plaintiff's insurer, who rejects an offer of judgment and later fails to recover more than the amount offered." See Young v. Midwest Fam. Mut. Ins. Co., 272 Neb. 385, 387, 722 N.W.2d 13, 16 (2006). Dutton is not entitled to attorney fees in this case.

CONTINENTAL'S CROSS-APPEAL

SUIT VERSUS CLAIM
The trial court determined that the PRP letter of September 23, 1985, was akin to a "suit" and that the letter triggered Continental's duty to defend. Continental argues that the PRP letter was not a "suit" and that because there was no "suit," Continental had no duty to defend. Continental asserts that its policies differentiate between "claims" and "suits" and that the duty to defend applies only to suits.
Continental argues that letters or administrative orders of environmental agencies are not "suits" triggering a duty to defend, relying on Foster-Gardner, Inc. v. Nat. Union Fire Ins., 18 Cal.4th 857, 959 P.2d 265, 77 Cal.Rptr.2d 107 (1998). In that case, the insured was ordered by the state EPA to remediate pollution. The insured sued its insurers when they refused to defend. The insurers argued that *447 the word "suit," as used in the policies, meant "a civil action commenced by filing a complaint. Anything short of this is a `claim.'" Id. at 878, 959 P.2d at 279, 77 Cal.Rptr.2d at 121. The court stated that the policies at issue required the insurers to defend a "suit" but that the policies allowed discretion to investigate and settle a "claim."
Continental's policy stated:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even, if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
(Emphasis supplied.)
The PRP letter from the EPA, dated September 23, 1985, informed Dutton that it was believed to be a party responsible for contamination of landfills. The letter stated that if the EPA used public funds to clean up the hazardous substances, "responsible parties may be . . . liable for all costs incurred by the government in responding to" the contamination. Dutton was directed to notify the EPA verbally by the close of business on October 1 and in writing by October 4 of the nature and extent of the actions it was willing to undertake. If the EPA did not receive the requested responses, it would assume that Dutton was declining to undertake the necessary response actions at the site and the EPA would proceed to take any action necessary.
The trial court determined that the PRP letter was a warning to Dutton that it could be responsible for the contamination. Dutton chose to accept responsibility for remediating the contamination. If Dutton had refused to take action, the EPA could have proceeded with its investigation, and if the investigation proved that Dutton was responsible, then a suit would have been initiated. The court noted that damages awarded as a result of a suit could have been greater if Dutton had not taken steps to mitigate by cleaning up the contamination.
The trial court concluded that a PRP letter is akin to a "suit," based upon "the severity and significant repercussions" if Dutton took no action. It noted that insurance companies such as Continental which insure for this type of damage have common knowledge of the outcome when the EPA is involved in addressing contaminations. The court relied on two cases: Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507 (9th Cir.1991), and Anderson Development Co. v. Travelers Indem. Co., 49 F.3d 1128 (6th Cir.1995).
In Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d at 1517, the court held:
[T]he EPA's administrative claims against the insureds triggered insurers' duty to defend. Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation. A fundamental goal of CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act of *448 1980] is to encourage and facilitate voluntary settlements. Interim Guidance on Notice Letters, Negotiations, and Information Exchange, EPA Memorandum, 53 Fed. Reg. 5298 (1988). It is in the nation's best interests to have hazardous waste cleaned up effectively and efficiently. But the insured is not required to submit to, and may in fact wish to oppose the threat. In either event, the insurer's duty to defend may well be triggered.
The federal court stated that a PRP notice differs from a "garden variety demand letter" in that it carries "immediate and severe implications," rather than simply exposing a party to a potential threat of future litigation. Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d at 1516. "[T]he PRP's substantive rights and ultimate liability are affected from the start of the administrative process." Id.
The court further noted that it may be "more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action." Id. at 1517. "Lack of cooperation may expose the insured, and potentially its insurers, to much greater liability, including the EPA's litigation costs." Id. As a result, "an `ordinary person' would believe that the receipt of a PRP notice is the effective commencement of a `suit' necessitating a legal defense." Id. "If the threat is clear then coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand." Id. at 1518.
In Anderson Development Co. v. Travelers Indem. Co., 49 F.3d at 1132, the federal court applied a recent Michigan case in which the state court determined that a PRP letter "constituted the initiation of a suit triggering [the insurer's] duty to defend." The federal court agreed with the state court's conclusion that a PRP letter issued by the EPA can be considered the "functional equivalent of a `suit' brought in a court of law." Id. at 1131.
Courts have reached differing conclusions as to what is necessary to trigger a duty to defend. Some courts have held that the receipt of a PRP letter invokes an insurer's duty to defend. In these cases, the courts have found the word "suit" to be ambiguous and defined it broadly, taking into consideration the perceived coercive impact of a PRP letter and the ability of the EPA to enforce strict liability in actions under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. See, e.g., Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507 (9th Cir.1991) (applying Idaho law); A.Y. McDonald Industries v. INA, 475 N.W.2d 607 (Iowa 1991); Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 618 A.2d 777 (1992).
Other courts have determined that the word "suit" should be liberally interpreted in favor of the insured. These courts looked at whether the EPA letters were coercive to determine if a PRP letter or a notification letter from a state agency triggered the insurer's duty to defend. See, e.g., Ryan v. Royal Ins. Co. of America, 916 F.2d 731 (1st Cir.1990); Professional Rental v. Shelby Ins., 75 Ohio App.3d 365, 599 N.E.2d 423 (1991).
Still other courts have determined that the word "suit" was unambiguous and applied the plain meaning of the word. As a result, they concluded that the commencement of some action in a court of law was required before an insurer's duty to defend is triggered and that the issuance of a PRP letter does not invoke the duty to defend. See, Ray Industries, Inc. v. Liberty Mut. Ins. Co., 974 F.2d 754 (6th Cir. 1992) (rejected by Anderson Development Co. v. Travelers Indem. Co., 49 F.3d 1128 *449 (6th Cir.1995)); Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16 (Me.1990); City of Edgerton v. General Cas. Co., 184 Wis.2d 750, 517 N.W.2d 463 (1994), overruled, Johnson Controls v. Employers Ins., 264 Wis.2d 60, 665 N.W.2d 257 (2003).
The interpretation of an insurance policy is a question of law. In reviewing questions of law, an appellate court resolves the question independently of the lower court's conclusion. Rickerl v. Farmers Ins. Exch., 277 Neb. 446, 763 N.W.2d 86 (2009). We agree with the rationale in Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., supra, and Anderson Development Co. v. Travelers Indem. Co., supra. Whether an insurer is required to provide coverage on a policy should not be dependent on whether the EPA proceeds with administrative remedies or files litigation. A PRP letter is the functional equivalent of a "suit" as described in the insurance policies, and therefore, the insurers had a duty to defend Dutton. The PRP letter from the EPA carried with it the EPA's coercive powers. Dutton conducted an investigation to determine whether it was a PRP and determined that it was. Dutton proceeded to plan for remediation and developed new methods in an attempt to save further expense.
The term "suit" can be readily understood to apply to actions that are the functional equivalent of a suit filed in a court of law. The PRP letter advised Dutton that it was immediately at risk. If Dutton declined the necessary response, its substantive rights and ultimate liability were affected from the receipt of the PRP letter. As noted in Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507 (9th Cir.1991), an ordinary person would believe that the receipt of a PRP letter was in effect the commencement of a suit. The language of an insurance policy should be considered in accordance with what a reasonable person in the position of the insured would have understood it to mean. Dutton I. The threats of the letter were clear and carried immediate implications. The trial court was correct in finding there was a "suit." Continental's cross-appeal on this issue has no merit.

NOTICE TO CONTINENTAL
Continental asserts that the trial court erred in finding that Dutton gave proper notice to Continental for two of the subsites. The court found that Dutton sent Continental a letter on November 1, 1985, informing the insurer about the PRP letter from the EPA. On December 2, 1991, Dutton sent Continental a six-page letter notifying it that the insurer had a duty to defend. Continental responded by letter dated February 14, 1992, stating that it did not intend to take any action. Continental's denial of liability under the policy eliminated any further requirement of notice. The trial court determined that these contacts were sufficient to show that Dutton provided proper notice to Continental.
This finding by the trial court was a factual one. A trial court's findings of fact will be upheld on appeal unless clearly wrong. See Albert v. Heritage Admin. Servs., 277 Neb. 404, 763 N.W.2d 373 (2009). The court's finding was not clearly wrong, and the record shows that Continental received sufficient notice.

ALLOCATION OF DAMAGES
Continental also argues that the trial court erred in relieving Dutton of its burden to prove that property damage occurred within the periods covered by the Continental policies and in adopting Dutton's categorization of damages. This argument relates to the court's use of the pro rata, time-on-the-risk method to allocate damages.
*450 The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008). We have previously determined that the method of allocation of damages used by the trial court was appropriate.
Continental also claims the trial court erred in failing to allocate damages from 1948, when the contamination allegedly began, to 2017, when the remediation is expected to be complete. We have previously discussed Dutton's request for declaratory relief, which was in effect a request for future damages, and we found no basis for such relief.
The trial court determined that Continental had provided coverage for 60 months of the 480-month period over which damages occurred. The court fixed Continental's percentage at 12.5 percent. In its brief, Continental calls this court's attention to the fact that it actually provided coverage for 74 months, which would in effect increase its potential liability. However, it asks this court to find that the damages should be spread over the entire period of 1948 to 2017, when remediation is expected to be complete. Continental suggests its coverage period of 74 months should be divided by the entire period to find its percentage of liability to be 8.8 percent, which would decrease its amount of liability.
We conclude that the trial court correctly limited the time of the occurrence to the period during which the contaminants were deposited, as opposed to the estimated time for the cleanup. This allocates the time on the risk to the period of the occurrence.
As to the fact that Continental may have had 74 months of coverage instead of 60, we note that Dutton did not assign this as error on appeal.

NORTHERN'S CROSS-APPEAL

OCCURRENCE
Northern's cross-appeal asserts that the trial court erred in finding there was an "occurrence" as defined by Northern's policies. Citing Farr v. Designer Phosphate & Premix Internat., 253 Neb. 201, 570 N.W.2d 320 (1997), Northern argues that in order to show there was an occurrence that was covered under the insurance policies, Dutton must have proved there was an accident and property damage from the accident that was neither expected nor intended. We conclude the court did not err in finding an occurrence within Northern's policies.
In City of Kimball v. St. Paul Fire & Marine Ins. Co., 190 Neb. 152, 206 N.W.2d 632 (1973), this court was asked to determine whether damages from seepage of a sewage lagoon system were covered as an accident. We noted that "`[i]n the absence of any express policy provision in such respect, the inability to fix the exact time when and where an accident occurred does not preclude recovery under the policy.'" Id. at 161, 206 N.W.2d at 637. We determined that an accident may be a process. "When the accident is a process, how long then is not significant. It is the nature of the process which is important." Id.
Courts have had difficulty in precisely defining the word "accident." In most jurisdictions, courts have held that the word has no technical meaning in law, but should be interpreted in its ordinary and popular sense. City of Kimball v. St. Paul Fire & Marine Ins. Co., supra. The *451 term "accident" has many meanings, and when used in a contract of indemnity insurance, unless otherwise stipulated, it should be given the construction most favorable to the insured. Id.
Northern's policies defined an "occurrence" as an accident, which includes continuous or repeated exposure to conditions. As the trial court concluded, the property damage occurred as a result of exposure to the continuous deposit of sludge or pollution in the landfills and on the manufacturing plant floor. Dutton did not expect or intend the resulting damage. Construing the term "accident" most favorably to Dutton, we conclude that the trial court did not err in finding there was an occurrence.

DAMAGES
Northern also argues that the trial court erred in several ways in determining damages. First, the court allegedly did not scrutinize the evidence offered by Dutton as to the amount of damages it sustained. As noted earlier, it is for the fact finder to determine the amount of damages and that determination will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. See Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008). Northern merely complains that the amount of damages claimed by Dutton was speculative because the amounts were not consistent. Northern claims the testimony was in conflict. As the trier of fact, the trial judge determines the credibility of the witnesses and the weight to give their testimony. Risor v. Nebraska Boiler, 277 Neb. 679, 765 N.W.2d 170 (2009).
Second, Northern objects to the trial court's failure to determine which portions of Dutton's damages were defense costs and which were indemnity costs. The court found that the total indemnity costs were $919,983.03 and that the total defense costs were $2,881,538.67. The court noted that defense costs are those costs necessary to determine the source of the contamination and to defeat or minimize liability to clean up the contamination. Indemnity costs are those costs incurred by Dutton to clean up the contamination.
Northern complains that the trial court merely accepted Dutton's figures at face value and did not provide a detailed analysis. However, the court excluded those damages (employee costs) which were not supported by the evidence and allowed those that were supported. Nebraska law only requires a plaintiff to prove his or her damages to a reasonable certainty; it does not require proof beyond all reasonable doubt. Eicher v. Mid America Fin. Invest. Corp., 275 Neb. 462, 748 N.W.2d 1 (2008). Northern provides no legal support for its contention, and we find no error in the trial court's determination.
Third, Northern claims the trial court erred in receiving into evidence Dutton's exhibit to support its claim for employee costs. The court determined that the evidence of employee costs related to the EPA matters was based upon guess and conjecture, and it refused to award damages for these costs. Thus, Northern was not prejudiced by this claim of error.
Fourth, Northern asserts that the trial court used the incorrect end date of 1987 in its time-on-the-risk allocation, rather than 2017, the expected end date of remediation. We have addressed this argument above, and there is no merit to this claim.
Finally, Northern argues that the trial court erred in allowing Dutton to recover damages incurred prior to its first notice to Northern. We have determined that Northern was not prejudiced by the timing *452 of the notice it received from Dutton, and this claim also lacks merit.

CONCLUSION
The trial court did not err in its judgment, and it is affirmed.
AFFIRMED.
CONNOLLY and STEPHAN, JJ., not participating.